# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE, FLORIDA

JAMES MELVIN CRAMER,

      Plaintiff,

      vs.                           **CASE NO. 3:13-cv-262-J-39JRK**

DR. PAGE A. SMITH &
DR. J. JORGE-CARABALLO,

      Defendants.

_____/

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ISSUE
OF LIABILITY AND SUPPORTING MEMORANDUM**

## MOTION

Pursuant to Fed. R. Civ. P. 56, Local Rules 3.01 & 3.03, the Court's current case management scheduling order (Doc. 143), and for the reasons outlined in his supporting memorandum, Plaintiff respectfully moves the Court to enter summary judgment that Defendants violated his 8th Amendment rights to adequate medical care.

## SUPPORTING MEMORANDUM

### I.    INTRODUCTION AND OVERVIEW

In early 2010, Cramer's "serious medical needs" and "risks of serious harm" were not limited to his serious infection treated by Defendants at the Department of Corrections, Regional and Medical Center in Lake Butler, Florida. (RMC). The decisions Defendants made treating Cramer with the antibiotic gentamicin also knowingly involved "serious medical needs" – avoiding or minimizing "risks of serious harm" from the treatment itself. The confluence of their decisions created a perfect storm of deliberate indifference to risks of gentamicin toxicity.

Defendant physicians knew that treatment with gentamicin as opposed to other (some more expensive) antibiotics carried risks of serious harm, particularly for a patient with known renal deficiencies.  Those risks included harm to his kidneys (nephrotoxicity) and damage to his vestibular nerves responsible for hearing and balance (ototoxicity). Yet, they chose to keep Cramer on IV doses of gentamicin (3 times daily) for more than five weeks.

They both knew that to avoid or minimize those risks required regular and periodic monitoring of blood drug levels and kidney functioning.  Yet, for over 35 days Defendants ordered no such tests.

Several weeks into his treatment, Cramer suddenly began complaining of symptoms of possible gentamicin toxicity, most notably nausea, vomiting and dizziness. Instead of discontinuing gentamicin while they investigated their cause, Defendants chose to treat the symptoms by prescribing anti-nausea medications and changing other drugs.   Only when Cramer's complaints continued into the second month of his treatment did Defendants finally order a kidney functioning test.  The results of that test on February 11, 2010, showed Cramer in kidney failure and the next day Defendants finally discontinued gentamicin.

When subsequent kidney testing and repeated flushings showed no significant improvement in renal functioning, Defendants transferred Cramer to Memorial Hospital in Jacksonville (MHJ) for further evaluation and treatment.   Transfer and discharge documentation make no mention of unmonitored treatment with gentamicin. Dr. Caraballo in responding to Cramer's detailed internal administrative grievance denied any care deficiencies and blamed Cramer's complaints on other medical problems, most significantly  diabetes.  The defense expert, Dr. Rakesh Sharma, echoes the same conclusions in his report.

Based upon his detailed review of Cramer's medical records, Court-appointed expert Dr. Loren Bartels concluded that Cramer has suffered permanent vestibular harm (equilibrium or balance deficits that have rendered him wheelchair bound and possibly hearing loss) due to gentamicin toxicity.  His report criticizes Defendants' treatment choices: the failure to choose another effective antibiotic without the risks of gentamicin, to maintain dosage levels despite Cramer's renal insufficiencies, and to forego periodic blood level and kidney monitoring tests for over 35 days.  Armed with Dr. Bartels' report, Cramer last year pursued yet another internal medical grievance in an effort to secure any possible help for his debilitating ailments.  It too was denied without investigation, testing, or referral to an expert for evaluation.[1]  The second court-appointed expert Dr. Donald Kern in his detailed report found that the deliberate indifference of Defendants with respect to their administration of gentamicin had caused Cramer to suffer serious medical needs or harm including impaired kidney functioning.

Defendants have finally admitted their care deficiencies but continue to attempt to defend their acts and omissions as garden-variety negligence at worst.  They will  highlight the need to treat aggressively Cramer's serious ("life-threatening") infection, reduction of his dosages, discontinuation of gentamicin after the February 11 test showed Cramer to be in kidney failure, and their transfer of Cramer to an outside hospital for further treatment and evaluation when his kidney functioning had not improved.  These are all commendable actions in themselves that constitute the antithesis of deliberate indifference to serious medical needs.  Unfortunately for Cramer, those actions came too late in his treatment to avoid the serious harms their deliberate indifference had already caused.

---

[1]Compounding the deliberate indifference of Defendants with institutional callousness.

An aggressive response to one serious medical need (an infection) does not give physicians license to make treatment decisions deliberately indifferent to serious medical needs or risks of harm from the treatment itself. Cramer's presentment with a serious infection did not pose a false choice: save his life or treat him in the manner they did. Defendants knew at the time how treat him properly with antibiotics and at the same time avoid dire consequences from an untreated infection. They just did not do it. Commendable but belated treatment decisions do not immunize earlier ones from scrutiny for deliberate indifference or gross inadequacies. Deficient cures with known risks of harm can prove worse than treated conditions.

The treatment decisions Defendants made do not require second-guessing by the Court. Defendants themselves knew better than to make the treatment choices they did. Cramer does not have to show that Defendants intended to cause him serious harm or injury or knew that such harm was likely to result from their acts and omissions in order to establish 8th Amendment liability. The record shows that Defendants were consciously aware of the risks of serious harm from Cramer's treatment with gentamicin and what needed to be done to avoid or minimize those risks. They simply failed to do what they *actually* knew at the time needed to be done. That transcends mere negligence, transporting the unfortunate results for Cramer into products of deliberate indifference. Claimed inadvertence of over five weeks duration does not shield their acts and omissions from constitutional scrutiny and redress.

II.     THE DECISION TO TREAT CRAMER'S INFECTION WITH GENTAMICIN

On January 3, 2010, Cramer (then age 63) was first seen and evaluated at RMC for treatment of his infection by Dr. Charles. Dr. Charles ordered 120mg loading dose(s) of gentamicin (120 mg) and that same day Dr. Nields, ordered a blood test – Complete Blood Count

(CBC) and Comprehensive Metabolic Profile (BMP) for Cramer.  Cramer was admitted to RMC

on January 4. On that day, Dr. Nields ordered a specimen drawn from Cramer's infection on his

buttocks for laboratory analysis to identify the bacteria involved in Cramer's infection. The

admission history (signed by Defendant Page A. Smith (Dr. Smith) and former defendant

Christopher Beiser, MSIV) reflects that they were awaiting the labs results that Dr. Nields had

ordered and noted the onset of treatment with "broad spectrum antibiotics."  The CBC and BMP

report issued late the morning of January 4 reflected abnormally high BUN and CREATINE

readings indicating Cramer suffered from kidney deficiencies. (RMC.LR1.4, 1.8; RMC.MISC)

     A.    CHOICE OF GENTAMICIN AND RISKS

     Both court-appointed experts document serious and well-known side effects of

gentamicin and the existence of alternative antibiotics with less risks but equal or greater efficacy

than gentamicin, particularly to a patient with renal deficiencies and diabetes. The well-known

risks involve kidney damage (nephrotoxity) and vestibular (inner ear) damage to hearing and

equilibrium functions (ototoxity), serious medical harms.  At the time they treated Cramer,

Defendants knew of these risks.  The proper uses and risks of gentamicin are covered in medical

school, FDA-mandated warnings (Copy attached), the Physicians Desk Reference (PDR), and

other authoritative medical publications.   Defendants also knew of other antibiotics without the

risks of gentamicin that could have been used to treat Cramer's infection.  Neither Defendant

could recall that they ever considered or discussed using any other antibiotic.  The culture report

from the lab on the January 8 report indicated the presence of MSRA and another bacterial agent.

That report, Defendants themselves, and the court-appointed experts all acknowledge or confirm

that other drugs as effective but less-risky than gentamicin could have been used. (S.Dep.8:15-

9:9, 14-15, 19:7-9, 20-21, 21:11-16, 22:6-23:12, 23-24; 45:16-23, 49:7-22 (that culture report's

ID of Linezolid was unavailable when Dr. Charles initially placed Cramer on gentamicin hardly

explains Dr. Smith's failure to prescribe that drug), 50:25-51:6; C.Dep.13:12-22, 14:10-16:25,

15:22-16:10, 32:25-32:19, 35-39, 55:11-16; Doc.119-1; Doc. 139-2; Doc. 131-5 and 131-6 Nos.

2, 4, 5; Doc. 131-1 Sharma Report (wound not doing as well); RMC.MISC - some records

indicate that gentamicin not effective at all)

B.      LACK OF INFORMED CONSENT BY CRAMER

When Dr. Smith first saw Cramer on January 4 or 5, Dr. Smith outlined in general terms

that he was going to oversee or supervise his intravenous antibiotic treatment, that there were

risks involved but that he had good experience with the drug and would monitor his treatment to

prevent any problems before they occurred.  Dr. Smith did not reveal the specific nature of the

risks nor did he disclose what monitoring measures or actions he would take to prevent potential

problems. Dr. Smith also did not mention let alone discuss any other antibiotic or treatment

options with Cramer. There is no documentation that Dr. Smith or anyone at RMC discussed any

of these details with Cramer. Cramer denies such details were ever shared with him by anyone

and had they been he would have refused Dr. Smith's outlined drug treatment. Defendants have

no knowledge that these details were ever discussed with Cramer but Defendant Dr. Caraballo

claimed that they are always discussed and that Dr. Charles would have done that so there was no

need for him or Dr. Smith to have repeated the information.[2] Both Defendants acknowledge they

were obligated to comply with Florida's informed consent law, Fla. Stat. §766.103(3)(a), and

---

[2]Defendant Caraballo claims that drug side effects are "always discussed" and that the most common side effects of gentamicin are kidney failure, hearing loss, and ototoxicity and assumes that Dr. Charles would have so informed Cramer but has no personal knowledge that was the case.  Cramer confirms no such discussion occurred.

claim that a generic, omnibus provision in Cramer's admission papers fulfilled those obligations:

"I wish to be admitted to RMC Hosptial and authorize said Hospital and physician assigned to furnish medical and/or surgical treatment, laboratory Test, X-rays, and examinations as my [sic] be deemed advisable during my stay in this hospital."

Plaintiff submits that this provision falls short of securing his informed consent to a drug regimen that carried the potential of permanently damaging his hearing or kidneys or rendering him wheelchair-dependent for life. *Gainesville Woman Care, LLC v. Florida,* SC16-381 (Fla. Feb. 16, 2017)(noting Florida's informed consent statute requires the health care professional to provide information about: 1) the nature of the procedure, 2) the medically acceptable alternatives to the procedure; and 3) the procedure's substantial risks). *McAleese v. Owens,* 770 F. Supp. 255 (M.D. Pa. 1991)(discussing constitutional underpinnings of right to informed consent) (Doc. 131-5 and 131-6 n. 1; S.Dep.33:7-34:21; C.Dep.8:11-10:16, 12:4-12, 34:7-35.3, 48:13-19; Doc. 14 ID106-109; P.SJ ___)

II.      PRECAUTIONS AGAINST THE RISKS OF GENTAMICIN NOT FOLLOWED

         A.      FIVE+ WEEKS WITHOUT CRITICAL MONITORING

         Defendant's expert, Dr. Sharma in his report, and Dr. Caraballo in his response to Cramer's detailed pre-suit grievance over his treatment with gentamicin, do not even mention the risks of gentamicin let alone the critical precautions for minimizing or avoiding those risks that were not followed.  Both court-appointed experts, however, emphasize as do all all authoritative medical references the importance of regular and periodic blood tests for measuring "peak" and "trough" levels of gentamicin in the blood and kidney functioning.  More significantly, Defendants themselves admit that at the time they treated Cramer they knew these were critical tools for monitoring the administration of gentamicin to a patient with kidney deficiencies. They

acknowledged that they had generally used these tools with prior patients treated with gentamicin for less time than Cramer was on the drug.  The medical records confirm and Defendants admit they *never* ordered blood tests for measuring gentamicin blood levels nor secured a follow-up (to the Jan 4 BMP) kidney-function test until the morning of February 11.  That BMP showed Cramer in kidney failure.  (Doc. 14ID pgs106-113, 115-117; Doc. 131-5 & 131-6 nos. 2 & 3; C.Dep.17-20, 26:19-28:8, 30:11-24, 30:25-32:19; S.Dep. 9:15-11:14, 11:22-12:22, 16-19, 24:18-23, 32:17-33:4, 42: 25-43:24, 55:17-56:5; RMC.POS & PPN.

After the initial loading dosage(s) of 120mg, Defendants repeatedly ordered 80mg dosages 3 times a day week after week. On February 9 or 10 (the dates differ between the physician's order sheet and progress notes), Dr. Smith must have realized the likely build-up of gentamicin in Cramer's blood and harm to his kidneys from over a month of unmonitored treatment because that morning he ordered kidney flushing to begin and a BMP. However, rather than immediately discontinue the gentamicin until the BMP report came back at the same time Dr. Smith ordered another 7 days of gentamicin, 3 times a day at the same 80mg dosage.  Dr. Caraballo on February 11 also ordered a BMP but "stat."   Even after the BMP report came back on the morning of February 11, neither Defendant discontinued the gentamicin.  Late that day, Dr. Caraballo ordered the dosages reduced to 40 mg and the next morning,  February 12,  ordered its discontinuation. RMC.POS & PPN; S.Dep.17:19-23 (should have been stopped)

Dr. Smith admits that between January 4 and February 11, Cramer's kidney functioning continued to worsen.  He further admits that had they been monitoring it weekly, they would have detected deteriorating kidney functioning and discontinued gentamicin sooner. Dr. Caraballo denies knowing that they should have done tests pursuant to any schedule, claiming

that their timing depends on the circumstances and the attending. However, neither Dr. Caraballo

nor Dr. Smith offered any medical reason or excuse that would justify any physician putting off

either test for over five weeks as was done here. Initially during deposition questioning Dr. Smith

could offer no explanation for why they had not been ordered.  However, in his earlier

interrogatory responses he claimed at the time RMC had a significant shortage of physicians and

the fact that blood drug levels were not done was "an oversight due to the heavy work load" that

Defendants had.  His responses to questions from his own counsel during his deposition arguably

qualify his explanation as either a "guess" or "poor excuse." [3] Dr. Smith had generally discussed

with Cramer at the outset of his treatment that there were risks but monitoring measures to

prevent any problems before they occurred. Standing orders for simple periodic blood draws by

nurses for these tests could have been entered by either Defendant at any time. Defendants knew

about the importance of these tests at the outset and obviously knew of their importance when a

BMP was ordered "stat" 37 days later. "Oversight" of critical tasks and acknowledgment of their

existence by words and deeds can hardly both occupy the same temporal space.  They daily

signed Progress Notes and Order Sheets for more than a month and obviously knew (despite Dr.

Smith's claim that he thought monitoring tests were being ordered) what was and was not being

done to treat Cramer.  Even if Dr. Smith had thought at some point tests were being done, he

could not have persisted in that belief for weeks on end given the absence of reported test results,

---

[3]He claimed they should have had six physicians and only had two, himself and Dr. Caraballo.  However, medical records from Cramer's own files show the presence of at least six physicians at RMC and Cramer confirms that more than two physicians treated patients at RMC.  The excuse rings hollow because a change in drugs or monitoring tests would have avoided Cramer's injuries with the stroke of one physician's pen.  Whatever factual merit Dr. Smith's staffing claim may have (and it appears not much if any), Cramer should not have to sacrifice his health to State staffing decisions inadequate to comply with its duties for providing constitutionally-adequate medical care to inmates. *Estelle v. Gamble,* 429 U.S. 97, 116 n.13, 97 S. Ct. 285 (1976)(Stevens, J., dissenting)

critical for avoiding known risks of gentamicin toxicity.  (S.Dep.11:22-12:22, 18:14-19.6, 53:17-54:12; RMC.POS & PNN; P. SJ; C.Dep. 18-20, 22:20-23:7, 23:11-28:8, 28:19-29:1, 29:15-31:21, 31:22-32:19, 32:24-33:13; Doc. 131-5 & 131-6 nos. 3&6; Doc. 14; P.B.Prod. Medical grievances and responses; P.B.Rogs)

B.    COMPLAINTS UNDERSCORED THE NEED FOR MONITORING

Approximately two+ weeks into his treatment with gentamicin Cramer started complaining about various conditions symptomatic of possible gentamicin toxicity.[4]  Common symptoms of gentamicin toxicity include complaints of dizziness, nausea and vomiting, balance and hearing problems. Cramer at least twice complained about protracted periods of nausea and vomiting (January 22-24 and February 8-10). The records also document sudden complaints about hearing and dizziness after weeks without problems.  Defendants acknowledge (in some instances begrudingly) at least some of Cramer's complaints could have been symptomatic of gentamicin toxicity. Cramer swears that his complaints were more frequent and severe than his records indicate.   Dr. Smith acknowledged that previously-unexperienced dizziness or equilibrium problems would have been reason alone to stop gentamicin.  However, he remembered no hearing or dizziness complaints.  Although the records do document dizziness, Dr. Smith did not immediately stop the gentamicin.  It is not clear that Defendants knew at the time of their treatment of Cramer (as opposed to what they discovered later in defending against

---

[4]Hearing problems are common symptoms of gentamicin toxicity according to the FDA-mandated warning and authoritative medical references. Cramer's hearing issues he experienced at the time of his admission to RMC were resolved by removing a build-up of ear wax, a problem Cramer had experienced before.  After his ears were cleaned, for several weeks he had no further problems then suddenly in late January he started experiencing hearing problems that persisted and endured a severe, protracted bout of nausea and vomiting. Cramer claims the medical records fail to document fully these and other unusual physical complaints he started experiencing.  (P.SJ is expected to confirm further these assertions but as of this submission has not arrived in the mail even though given to prison authorities for mailing on Tuesday.) (Doc. 14 pg.ID 113 ¶¶ 49, 50, pg.ID ¶ 68; P.B.Rogs No. 24)

this suit) that Cramer's medical records revealed some limited instances of dizziness or balance

issues. However, those experiences differed from those Cramer complained of while on

gentamicin and, in any event, Defendants never at the time did anything to investigate whether

differences existed. There is no evidence that any of Cramer's complaints whether about hearing,

nausea or vomiting, or anything else triggered an investigation into the cause until Dr. Smith

finally ordered testing (BMP and kidney-flushing) on the heels of another protracted bout of

nausea and vomiting.  Yet neither Defendant could explain why they had not ordered testing after

Cramer's first sudden and protracted bout for which, instead of testing, they prescribed anti-

nausea medication and changed a second drug. Until Dr. Smith ordered the kidney-functioning

test, Defendants had responded to Cramer's disturbing complaints only by treating his symptoms

rather than stop the drug and investigate their cause. (RMC.PPN & POS; S.Dep.24:24-25:20,

25:21-24, 26:9-25; 27:1-14; 28:13-29:6, 39:24-40:8, 42:6-18, 43:12-23, 45:24-46:18, 51:7-52:16,

53:17-54:12; P.SJ ___; Doc. 14; C.Dep. 38:15-45:7, 45:18-46:25, 47:11-48:3, 58:6-12, 59:5-

60:20, P.B.Rogs)

III.    THE AFTERMATH OF UNMONITORED ADMINISTRATION OF GENTAMICIN

        During their depositions, both Defendants denied that there was ever any effort to cover-

up or hide admitted mistakes from which they could no longer run.  However, events and other

evidence suggest that may not be entirely true. (C.Dep. 48:24-55:10; S.Dep. 39:13-41:24)

        None of the documentary evidence concerning Cramer's transfer to a private hospital

even mention his 37 days of unmonitored gentamicin.  If a patient needs to be transferred for

evaluation and treatment by experts for kidney failure (which at least Dr. Smith admits was likely

due to gentamicin toxicity) why on earth would his doctors not disclose the details of their

treatment that likely caused the kidney failure? Obscuring or covering up their mistakes would appear a plausible if not likely answer. Instead, at the time (and even years later) Defendants attributed the reason for Cramer's transfer to other varying explanations.  Several documents (including one in Dr. Smith's own hand) attribute the transfer to the fact that his infection had worsened or at least failed to improve during his treatment, a fact also documented by the physician at MHJ who examined and admitted Cramer.   Another proffered explanation has been that Cramer had a pain in his abdomen and he needed a CAT scan and RMC's machine was out of order.  The Court-appointed expert, Dr. Kern, even noted these oddities in his report but without expressly assigning to them any explanations.   RMC.MISC; C.Dep. 48:24-55:10; S.Dep. 39:13-41:24, 53:23-54:12; Doc. 139-2)

        Defendant Caraballo in responding to Cramer's detailed internal administrative grievance over his treatment with gentamicin denied that: that there was any gross negligence, medical malpractice, deliberate indifference, or deviations from medical standards by RMC phsicians;  Cramer received "excessive" amounts of antibiotics; Cramer had ever showed signs of kidney failure, or that his medical complaints were the result of his antibiotic therapy or hospitalization at RMC but instead were caused by other pre-existing medical problems, most significantly  diabetes.  Armed with Dr. Bartels' report, Cramer last year pursued yet another internal medical grievance in an effort to secure any help at all for his troubling ailments.  It too was denied without investigation, testing, or referral to an expert for evaluation.   Many of the factual assertions made by Dr. Caraballo or by DOC in response to Cramer's grievances now stand contradicted by the medical records, Defendants' own belated concessions, and the findings of the Court-appointed experts. If the fact-finder proves able to conclude from the evidence a

possible finding of intentionally shielding the truth from the light of day for the better part of a

decade, an adverse inference could arguably be drawn. *See generally, Reeves v. Sanderson*

*Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S. Ct. 2097 (2000)(factfinder entitled to consider

a party's dishonesty about a material fact as "affirmative evidence of guilt.")(Doc.139-2; Doc.

139-3; Doc. 139-13; Jurats; S.Dep. & C.Dep*., in passim;* Doc.131-5; Doc. 131-6; Doc. 113-1;

Doc. 113-2; Doc.14; P.B.Rogs; P.B.Prod)

## IV.    DEFENDANTS VIOLATED THE EIGHTH AMENDMENT RIGHTS OF CRAMER

Defendants will renew their argument that their acts and omissions constitute, at worst,

negligence or medical malpractice which is not subject to redress under the Constitution.

Discovery and medical records now document what Defendants did to treat Cramer and what

they actually knew when they did it.  That record establishes that their conduct transcends

negligence and violated Cramer's rights under the constitution.

Defendants knew of the risks of serious harm – ototoxity and nephrotoxicity – posed by

their choice to maintain antibiotic treatment with gentamicin. They knew that simple blood tests

for assessing blood levels of the drug and kidney functioning were critical to avoiding or

minimizing those risks, particularly in a patient with known kidney deficiencies.  However, for

over five weeks they failed to order any critical testing for avoiding the risks or investigating the

cause of Cramer's interim complaints, possible symptoms of gentamicin toxicity.   They claim

the lack of testing for over a month was simply an "oversight."  What was said to Cramer at the

outset of his treatment, the passage of time and voicing of complaints by Cramer during his

treatment, Defendants' admissions that they were at the time of treatment *actually* aware of both

the risks and the importance of monitoring in avoiding those risks, and the eventual but sudden

start of testing all challenge the factual accuracy of Defendants' "oversight" claim.

Factual inaccuracies aside, more importantly the claim fails to provide a legally sufficient defense to or excuse for *their* deliberate indifference on this record. To be sure the Constitution does not condemn mere inadvertence or good-faith mistakes by a physician. *Adams v. Poag,* 61 F.3d 1537, 1544-45 (11th Cir. 1995) The 8th Amendment standards for assessing a health care professional's actions (whether "deliberate indifference to serious medical needs" or "grossly incompetent or inadequate" treatment so as to shock the conscience) disapprove "second-guessing" the adequacy or sufficiency of their actions. However, where, as here, physicians actually know of risks of serious harm and know what can be done to avoid or minimize those risks (prescribe a different antibiotic or regularly monitor the chosen drug's impact), and for reasons having nothing to do with the exercise of medical judgment fail to take either action for weeks on end, the constitution provides both scrutiny and an avenue for redress. Order, Doc. 128 at 4-8 (discussing cases).

While the lab report of January 8 showed the infections susceptible to treatment with gentamicin, that report also showed it was treatable with other antibiotics with less risks of permanent harm than gentamicin. While expense and possibly availability may have influenced the immediate choice of drugs when Dr. Charles initially put Cramer on gentamicin, neither speaks to medical judgment demanded with assessing the serious risks of keeping the renally-impaired, diabetic Cramer on gentamicin long term. Moreover, the failure of Defendants to secure Cramer's informed consent for his treatment, to investigate his serious interim complaints symptomatic of possible gentamicin toxicity, and to delay monitoring needed to avoid the known serious effects of gentamicin for over five weeks represent "more than mere negligence." *Ancata*

-14-

*v. Prison Health Servs, Inc.,* 769 F.32d 700, 704 (11ᵗʰ Cir. 1985)(intentional refusal to provide known medical care and treatment delayed for non-medical reasons both constitute deliberate indifference).[5] The Defendants' acts and failures to act represent treatment that is grossly incompetent and inadequate, totally devoid of any medical excuse or justification.

This case is not a matter of Defendants not knowing what *should* have been done to avoid known risks of serious harm to Cramer.  They knew what needed to be done and without excuse but for claimed "oversight" did not do it.  Were a claim of oversight or inadvertence sufficient to remove a physician's acts and omissions from constitutional scrutiny under these circumstances, it would be hard to imagine any actions, however egregious, for which 8ᵗʰ Amendment redress would lie. The U.S. Supreme Court did not recognize duties to provide inmates constitutionally-adequate medical care while at the same time provide the States' medical professionals with "get out of liability free" cards –  the simple expedient of claiming "I forgot."  The 8ᵗʰ Amendment does not give medical professionals rights to blink in the face of the obvious – turning their backs on known measures for avoiding risks of serious harm to their inmate patients.  *Estelle,* 429 U.S.

---

[5]The Eleventh Circuit has sometimes indicated that "deliberate indifference" requires "more than gross negligence" while in other cases "more than mere negligence." *Melton v. Abston, et al.,* 841 F.3d 1207, 1223 n.2 (11ᵗʰ Cir. 2016) The footnote discussion in *Melton* explains why that panel believed that the "more than mere negligence" standard should control. It found that language more consistent with *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S. Ct. 1970 (1994) as well as dictated by the first and controlling prior panel opinion, *McElligott v. Foley,* 182 F.3d 1248, 1255  (11ᵗʰ Cir. 1999) Eleventh Circuit as well as District Court opinions have continued to employ both standards in articulating the deliberate indifference standard. *See, e.g., Montelone v. Corizon,* 15-11906 (11ᵗʰ Cir. April 20, 2017)(unpub)(reciting *McElligott* standard); Order (Doc. 128)(at 4: reciting more than gross negligence as standard from *Townsend v. Jefferson County,* 601 F.3d 1152, 1158 (11ᵗʰ Cir. 2010))   Cramer does not claim that Defendants *intentionally* prescribed gentamicin and refused to monitor it knowing it would likely harm him.  But violations of the 8ᵗʰ Amendment do not require intentional acts knowing they are likely to cause harm to an inmate. *Farmer,* 511 U.S. at 835-839.  It requires conscious disregard of the risks of harm.  Here Defendants consciously made numerous treatment decisions and entered numerous orders daily over the course of more than 5 weeks of treating Cramer knowing from training, experience, and literature that they also needed to monitor that treatment.  Whether classified as "more than mere negligence," *Farmer,* 511 U.S. at 834 (noting it has read *Estelle* as requiring more than due care) or "more than gross negligence" the conscious failure of Defendants to have acted on their actual knowledge sooner epitomizes "deliberate indifference."

at 104 n.10 (citing with approval circuit court opinions in which physicians violated this standard including *Thomas v. Pate*, 493 F.2d 151, 158 (C.A.7), *cert. denied sub nom. Thomas v. Cannon*, 419 U.S. 879 (1974) (injection of penicillin by nurse with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction)).  Defendants gave gentamicin (repeatedly) to a patient with known greater risks of susceptibility to its serious toxic effects while at the same time failed to employ known means for avoiding them.  *See* **DELAY.** *Goebert v. Lee County,* 510 F.3d 1312, 1327-28 (11th Cir. 2007)(delay in treatment can constitute deliberate indifference depending on the seriousness of the medical need, whether it worsened condition, and reason for the delay); **GROSSLY INADEQUATE CARE.** *Melton v. Abston,* 841 F.3d 1207(indicating funding or money does not excuse providing grossly inadequate care, taking an easier but less effective course, or providing only cursory care); *Greason v. Kemp,* 891 F.2d 829, 835 (11th Cir. 1990) (and not precluded by counter-expert opinion that doctor complied with standards of care); *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986);  *Howell v. Evans,* 922 F.2d 712, 719-20 (gross deviations from accepted medical practices), *vacated as moot,* 931 F.2d 71 (11th Cir. 1991); *Williams v. O'Leary,* 805 F. Supp. 634, 638 (N.D. Ill. 1991)(negligent treatment alone may constitute deliberate indifference if protracted); *Parham v. Johnson,* 126 F.3d 454, 457-58 (3d Cir. 1997)(treatment contrary to PDR); **DELAYS OR FAILURES TO INVESTIGATE.** *McElligott v. Foley,* 182 F.3d 1248, 1256-58 (11th Cir. 1999); *Vaughn v. Gray,* 557 F.3d 904, 909 (8th Cir. 2009)(failure to respond to inmate who vomited through night with testing to find cause); *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir. 2004)(failures to test despite known danger signs); *Delgado v. Shoar,* 3:13-cv-624 (M.D. Fla. Oct 30, 2014)(delays in testing for colon cancer despite numerous indicators contributed to doctor's deliberate indifference).

Cramer does not have to prove (and is not claiming) that the Defendants' actions and inactions were malicious or done with the intent to injure him. *Farmer,* 511 U.S. at 835-839. Gentamicin toxicity posed serious risks of harm to Cramer.   Avoiding those risks was a serious medical need of Cramer's. Combating his infection was not the only serious need he confronted. Defendants' knowledge of those risks of harm and the means for avoiding them does not depend on their need to draw the inference of harm.  *See Farmer,* 511 U.S. at 837: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   Defendants admitted they already knew of both the risks of harm and means for avoiding those risks.  Their failure to act on that knowledge was not an isolated "oversight" confined to a singular opportunity.   The medical records document Defendants daily reviewed documents and made decisions throughout the course of Cramer's treatment. Their unmonitored administration of gentamicin to Cramer for over five weeks was not an objectively reasonable response to the risks of harm Defendants knew confronted Cramer.  *Farmer,* 511 U.S. at 844-845.  Instead, they disregarded those known risks by actions and inactions that constituted grossly inadequate administration of gentamicin. That they did not do what they knew they should have done and had no medical justification for not doing is, or Cramer respectfully submits should be, shocking to the conscience.

For all the foregoing reasons, Plaintiff respectfully moves the Court to enter summary judgment on his claim that Defendants violated his 8th Amendment rights to adequate medical care.

Respectfully submitted for e-filing this 3rd day of May, 2019

s/Jeffrey H. Klink
Jeffrey H. Klink (FBN: 151657)
Jeffrey H. Klink, P.A.
8916 South Mobley Road
Tampa, FL 33626-1509
TEL: 813.792.9076
EMAIL: jhklink@gmail.com

Counsel for Plaintiff
James M. Cramer

**Certificate of Service**

I CERTIFY that unless the undersigned encounters e-filing snags, Plaintiff's summary judgment motion, supporting memorandum and additional referenced SJ exhibits (unless their absence is otherwise addressed and explained in Plaintiff's "Index and References to SJ Record") were e-filed on the above date and that all counsel of record will receive notice of and access to copies of same pursuant to the Court's CM/ECF system.  A copy of the Motion and any documents not previously provided to Plaintiff or  will be mailed to him on May 4, 2019.

s/J.H.Klink
Jeffrey H. Klink