UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES MELVIN CRAMER,

    Plaintiff,

v.                                 Case No.: 3:13-cv-262-BJD/RK
DR. PAGE A. SMITH &
Dr. J. JORGE-CARABALLO,
    Defendants.

_____/

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS SMITH AND JORGE-CARABALLO

Defendants Smith and Jorge-Caraballo (hereinafter "Defendants"), through undersigned counsel and pursuant to Fed. R. Civ. P. 56, respectfully request that the Court grant summary judgment to Defendants in this case. As reasons, therefore, Defendants state:

I.)    Plaintiff cannot prove a claim of medical deliberate indifference against Defendants.

II.)    Defendants are entitled to qualified immunity.

## Preliminary Statement

1.      At the times alleged in the Amended Complaint (Doc. 14), Plaintiff, James Cramer ("Cramer" or "Plaintiff"), was and is a state prisoner in the custody of the Florida Department of Corrections ("FDOC"), and is currently assigned to Blackwater Correctional Facility.   See FDOC's Offender Search page, http://www.dc.state.fl.us/AppCommon (last visited May 2, 2019) (James Cramer, FDOC# Y02665).

2.      In the Amended Complaint, Cramer names Christopher Beiser, Dr. Page Armand Smith, and Dr. Jorge-Caraballo, and the Secretary of the Department of Corrections as Defendants in this suit. (Doc. 14 at 4-5.) Cramer brings this action pursuant to 42 U.S.C. § 1983, alleging that the above-named defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment between January 4, 2010, to February 19, 2010. (Id. at 6-26.) Specifically, Cramer alleges that the Eighth Amendment was violated with the administration of the drug Gentamicin. (Id.)

3.      On March 6, 2014, Dr. Beiser filed a motion to dismiss, which Cramer responded to. (Docs. 31, 40.)

4.      Defendants Smith and Jorge-Caraballo's, along with the Secretary of the Department of Corrections, filed a Motion to Dismiss. (Doc. 43)

5.      Defendants' Motions to dismiss were denied, except as to the Secretary of the Department of Corrections. (Doc. 61).

6.      Defendants were ordered to answer and now file their Motion for summary

2

judgment.

7.      Plaintiff and Defendant Beiser filed a joint motion to dismiss which was granted. (Docs. 125, 128).

8.      Plaintiff filed a complaint in the Southern District of Florida, wherein Plaintiff states that the Defendants explained to him the dangers of the drug Gentamicin.  [Ex O p6-7.]    Also, in that complaint, plaintiff alleges that the Defendants did not take the precautions to prevent him from toxicity poisoning. [Id. At 8]

## Plaintiff's Factual Allegations

Plaintiff Cramer *alleges* in the Amended Complaint (Docs. 14) the following regarding the Defendants:

9.      Cramer incurred complications as a result of surgery to remove a boil that required treatment with the antibiotic, Gentamicin, at the Reception and Medical Center of the FDOC in Lake Butler, Florida. (Doc. 14 at 6, 11-12.) The treatment with the antibiotic occurred from January 5, 2010, through February 25, 2010.  (Id.)

10.     Doctors Smith and Jorge-Caraballo were Dr. Beiser's supervisors.  (Id. at 11, 20.) Dr. Beiser was a medical student at the time. (Id. at 8.)

11.     Dr. Smith ordered blood tests to determine Cramer's treatment regimen, and then determined that Gentamicin should be used intravenously to encourage Cramer's healing process. (Doc. 14 at 11-12.)

12.     Dr. Smith initially oversaw Cramer's progress for the first six days, and then supervised Dr. Beiser thereafter for at least 22 days. (Id. at 14-15.)

13.     Dr. Jorge-Caraballo supervised Dr. Beiser for at least 17 days. (Id. at 20.)

14.     Doctors Smith and Jorge-Caraballo knew of Cramer's medical history, had notice of the potential complications associated with Gentamicin, should have tested Cramer for toxicity during the administration of the antibiotic, and should have more closely supervised Dr. Beiser to ensure that he tested Cramer for toxicity.  (Id. at 13, 15-19, 21-23.)

15.     Cramer alleges that, because of toxic poisoning, he was injured. (Id. at 23.)

16.     Cramer's claims that Smith and Jorge-Caraballo failed to properly train and/or supervise Beiser. (Id. at 7-8.)

17.     Plaintiff claims his injuries are loss of balance, dizziness, loss of focus, confusion, motion sickness; loss of hearing; loss of equilibrium; aggravated kidney disease; anemia; and  hallucinations.  (Id. At 23).

18.     Plaintiff seeks $500,000 in compensatory damages from each Defendant and $500,000 in punitive damages.  (Id. At 24).


## DEFENDANTS' ALLEGATIONS

1.     Plaintiff was a 62-year old mail who was transported to RMC on January 4, 2010, after failed treatment at Martin CI for a peri rectal abscess, Methicillin-resistant

Staphylococcus Aureus (MRSA), a potentially deadly bacterial infection. [Exs. L. Deposition of Dr. Caraballo, p25-26,56; K, Deposition of Dr. Smith,  p 36L10-25]

2.      At the time of this incident, both Defendants were employed by the Florida Department of Corrections at Reception Medical Center (RMC),  and Dr. Smith was the Executive Medical Director. [Exs. A, Declaration of Dr. Smith, Ex. B, Declaration of Dr. Caraballo].

3.      Both Defendants were involved in Plaintiff's medical care while he was at RMC from January 4, 2010 to February 19, 2010, 2010. [Id.]

4.      Plaintiff presented with a previous history of diabetes, hypertension, hyperlipidemia, gerd, hearing loss and diabetic neuropathy. [Ex. C, Admission to RMC]

5.      Plaintiff was treated daily and seen on a daily basis by medical practitioners, including student Beiser who reported to both Defendants Smith and Caraballo. [Exs. A. B]

6.      Upon admission, labs were ordered, and broad-spectrum antibiotics were started, and on January 3, 2010, Plaintiff was started on Ampicillin and Gentamicin by Dr. Charles, the Emergency Room Doctor at RMC. [Ex. C, Authorization for Treatment, Ex. D, Medications]

7.      The Plaintiff's sugars were closely monitored through routine blood tests and he was examined daily by a medical practitioner.  [Ex. G, Report of Expert, Dr. Sharma, Ex. ]

8.      At the time, Defendants were involved in his treatment, they did not see him every day because he was being seen on a daily basis by the medical student Beiser. [Exs.

A, B]

9.    The complaints made by Plaintiff  concerned symptoms that Plaintiff had suffered prior to being placed on Gentamicin, and the complaints were addressed. [Exs.  G; I, Doctors' Progress notes,  N, Nurses' Daily Progress Notes ]

10.    When it was determined that the Gentamicin was affecting Plaintiff, it was stopped and Plaintiff was given IV fluids. Renal function was closely monitored through labs. [Exs. G, K, p31; L,  p25, 26].

11.    When inmate Cramer kidney function did not improve, he was transferred to outside hospital for specialist to monitor his kidney functions. [Ex. A; F, Discharge Summary from Memorial Hospital; K,  p31; L, p, 49.]

12.    At no time during the inmate's treatment did Defendants ignore any complaint or problem that Defendants were made aware of by either medical student Bieser or Plaintiff. [ Ex. A, B]

13.    At no time, during his treatment were Defendants aware that Plaintiff's blood was not being tested for toxicity, until the decline in kidney functioning. [Ex. A,B]

14.    Plaintiff's BUN level returned to the range it was or had been prior to Plaintiff's being placed on the Gentamicin. [Exs.  F; J, Discharge from RMC, M, Plaintiff's blood test results]

## I.   STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323. The non-moving party must then show though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case." Celotex Corp., 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson, 477 U.S. at 252). All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, Beard, 548 U.S. at 529 (noting the distinction "between evidence of disputed facts and disputed matters of professional judgment."), but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)). "Where the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587 (other citation omitted). "Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. The Archdiocese Of San Juan of Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979) (quoted in Ernie Haire Ford, Inc., 541 F. Supp. 2d at 1297–98)).

## II.   Medical Deliberate indifference

Plaintiff is currently  67 years of age and entered the custody of the Department of Corrections in 2000.    FDOC's Offender Search page, ttp://www.dc.state.fl.us/AppCommon (last visited May 2, 2019) (James Cramer, FDOC# Y02665).    Plaintiff has been diagnosed with many health problems and with MRSA prior to Plaintiff being transferred to RMC in 2010. Plaintiff was on "intensive regimen, which included Gentamicin should be used intravenously to encourage Cramer's healing process.    Plaintiff alleges that Doctors Smith and Jorge-Caraballo knew of his medical history, had notice of the potential complications associated with Gentamicin, should have tested Cramer for toxicity during the administration of the antibiotic, and should have more closely supervised Dr. Beiser to ensure that he tested

Cramer for toxicity. (Doc. 14 at 13, 15-19, 21-23.)

The Eighth Amendment imposes an obligation on state governments "to provide minimally adequate medical care to those whom they are punishing by incarceration." Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991). Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's prohibition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Johnson v. McNeil, 278 F. App'x 866, 870 (11th Cir. 2008) (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citing Hill, 40 F.3d at 1188–89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

After showing a serious medical need, a "prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)); see also Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary

treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

> "[W]hen the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference." Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995).  In either situation, the need must be "one that, if left unattended, poses a substantial risk of serious harm." Farrow v. West, 320 F.3d 1235, 1245 (internal quotations and citations omitted).  "The plaintiff must prove that the defendant 'actually knew' of the risk[ ]'[p]roof that the defendant should have perceived the risk, but did not, is insufficient.' "

Kruse v. Williams, 592 F. App'x 848, 856 (11th Cir. 2014) (citation omitted) (brackets in original). Additionally, an official "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. 825, 844, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Third, a distinction must be made between deliberate indifference and gross negligence. See McElligott, 182 F.3d at 1255

> Conduct that is more than mere [gross] negligence includes:
> (1) knowledge of a serious medical need and a failure or refusal to provide
> (2)  care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all.

McKeithen v. Jackson, 606 F. App'x 937, 939 (11th Cir. 2015) (citing McElligott, 182 F.3d at 1255), cert. denied, 136 S. Ct. 802, 193 (2016).

Plaintiff alleges that his Eighth Amendment right was violated by the delay in providing blood tests to monitor his blood for toxicity and by the administration of the drug Gentamicin.  (Doc. 14 at 6-26).

A.  The administration of the Gentamicin

Plaintiff was treated with the antibiotic from January 3, 2010, through February 19, 2010. (Id.)      The emergency room doctor placed Plaintiff on the Gentamicin. [Ex. C]. The Gentamicin was in the standard of care, it was a drug recommended for the treatment of the both bacteria in present Plaintiff, MRSA and (Kliesiella) pneumonia. [Ex. H, Ex. K p22; L p39] Plaintiff's deadly bacteria had not previously responded to treatment, which is why Plaintiff was admitted to RMC. [Ex. C ] Gentamicin is used to treat certain serious infections that are caused by bacteria such MSRA and according to the Defendants, Gentamicin was recommended for treatment of both the MRSA and the other bacteria present. [Exs. H; Ex. K, p22, Ex. L., p39].    Plaintiff's initial dosage was 120, on January 3, 2010, but it was later reduced to 80 mg at RMC. [Ex. D, p5].  The 80 milligrams dosage is a common dosage for someone receiving the drug. [Ex. K, p14].  The determining factor regarding the amount of the dosage is that if you are treating with the drug, that dosage has to be given.[Id.]   Plaintiff filed a complaint and stated that the dangers of the drug were explained to him. [Ex. O, p7)

Plaintiff's complaints during treatment did not provide Defendants with notice of toxicity because they were not solely indicative of gentamicin toxicity.   [Exs. H; Ex. K,p26; Deposition of Dr. Caraballo  p39] .  Plaintiff's complaints were as follows:

On January 5, 2010, Plaintiff complained of pain in his buttocks which had been present since before Christmas.   [Ex. E, Doctor's progress notes, p9, entry dated 1/5/2010]; January 6, he complained of rectal pain; [Id., entry dated 1/6/2010]; January 7, 2010, Plaintiff

complained of constipation, and was given Colace, [Id., entry dated 1/7/10]; On January 8, Plaintiff complained on constipation, and pain in his rectum, and was given Ibuprofen for pain and Colace, [Id., entry dated 1/8/2010];  On January 9, and 10, 2010,  Plaintiff's was without complaint and his vital signs were stable.  [Id. at 10, entries dated 1/9/2010, 1/10/2010];  On January 11, Plaintiff stated that he was feeling better and that he had bowel movements. [Id. at 10, entry dated 1/11/2010].

 On January 22, 2010, Plaintiff complained of a loss of appetite the night before, but stated that it had returned. [Id. at 16, entry dated 1/22/2010]. On the weekend of  January 23, 2010, Plaintiff complained of nausea and vomiting, and on January 25, 2010, in response to that complaint, the drug Ceftazidime was changed to Ceftriaxone.  [Id. at 16-17, entries dated 1 /23/2010, and 1/25/2010].  On January 31, 2010, Plaintiff complained of Heartburn and was proscribed zantac.  [Id. At 19, entry dated 1/31/2010].   Plaintiff had no new complaints on January 12, 13, 14, 15, 19, 20, 21, 24, 26, 27, 28, 30, 2010.  [Id. at 12-18, entry dated same as date of examination.]  On January 16, 17, 18, 2010,  Plaintiff was without complaint and his vital signs were stable.  [Id. at 13-14, entry dated same as date of examination.]  On February 1, 2010, Plaintiff was seen and it was noted that he complained of heartburn over the weekend and that his wound showed little improvement. The doctor talked to Plaintiff about a surgery consult but Plaintiff stated he wanted to try medical therapy for two weeks. [Id. at 17, entry dated 2/1/2010].

 Plaintiff had no new complaints on February 2, 3, 4, 5, 6, 7, 9,  2010. [Id. at 20-23,

entry dated same date as examination.] On February 8, 2010, Plaintiff complained of dizziness and nausea, and was proscribed Avandia and motrin.  [Id. at 12, entry dated 2/8/2010]  On February 10,  2010, Plaintiff complained of dizziness and nausea, tests were ordered CBC, BMP, and Plaintiff was given fluids. [Id. at 24, entry dated 2/10/10].   On February 11,  2010, Plaintiff reported that he no longer felt  dizzy and nausea. [Id., entry dated 2/11/2010].   On February 12,  2010, Plaintiff reported that he no longer felt  dizzy and was not nauseous. [Id. at 25, entry dated 2/12/2010].   Plaintiff had no new complaints on February 13, 14, 15, 16, 17, 18,  2010,  [Id. at 25- 28 entry dated same date as examination.] On February 19, 2019, Plaintiff was transported to Memorial Hospital in Jacksonville, Florida. [Ex. N, p102].

During that time, Plaintiff's sugars were closely monitored through routine blood tests, and he was examined daily by a medical practitioner. [Exs. I, Doctors Progress Notes,  N, Nurses Progress notes from January 3, 2010, through February 19, 2010].   Other antibiotics were available for prescription including ampicillin, ceftazidime, ceftriaxone, and cefalexin. [Ex. D, List of Daily Medications]   Plaintiff was prescribed other drugs during the course of treatment; such as Ampicillian which was started on January 3, 2010, the same day as Gentamicin.  [Id.]

Plaintiff was placed on Gentamicin to treat a seriously deadly bacterial infection, MRSA; and if Plaintiff had not been treated for the infection, he would have become septic and died.  [Ex. K, p36 L 10- 25] The side effects of the drug were explained to Plaintiff. Ex. O,

p7]  Plaintiff refused surgery, and Plaintiff needed a strong antibiotic to treat MRSA. [Id. at 17, entry dated 2/1/2010].   The antibiotic was effective because Plaintiff survived the infection. The antibiotic was a drug recommended for treatment of both bacteria present in Plaintiff. [Ex. H; Ex. K, p22, Ex. L., p39].  According to Defendants, all other medications in the same class as the one chosen for Plaintiff, have the same toxicities.  [Ex. K Deposition of Defendant Smith, p21-22].  Plaintiff cannot prove a claim for deliberate indifference  because a doctor's choice of treatment is generally, as with the facts herein, a matter of medical judgment. Wright v. Langford, 562 F. App'x 769, 779 (11th Cir. 2014) (citing Estelle, 429 U.S. at 107.).

### B.  Failure to test for toxicity

 On  the  days,  Plaintiff  made  complaints,  the  complaints  were  addressed.    On January 25, 2010,  Plaintiff complained of vomiting over the weekend, and in response to that the drug, Ceftazidime was changed to Ceftriaxone.[ Ex, I  p17].   On February 10, 2010: due to nausea and vomiting, lab tests were ordered (CBC and BMP). [ Ex, I  p24]. February 11, 2010: nausea and vomiting were resolved and labs revealed the following: WBC 3.8, H&H 9.4 and 27.9, PLT 235, NA 139, K 4.8, BUN 35, CRT 2.8, CL 107, BICARB 28. [ Ex, I p24]. This is  an increase in his renal function from his baseline. This was recognized and addressed  by  the  physicians  in  their  actions  the  next  day.   February  12,  2010: The Gentamicin was stopped and the patient was given IV fluids.   Renal function was closely monitored through labs. [ Ex, I  p24]  Labs on this day showed that the CRT at 2.9, which is not a significant change from the previous day. [ Ex,  p3] February 15, 2010: patient declined

IV fluids despite the importance of these being discussed with him. [ Ex, I  p26] .  The wound was not doing as well as previously.  February 17, 2010: labs were monitored and the CRT improved to 2.3.  [ Ex. I, p27]   February 19, 2010: patient developed left lower quadrant pain and was transferred to outside hospital due to unavailable CT.  Patient's CRT continued to improve further to 1.72 per new blood test. [ Ex, M p102].

Plaintiff alleges that  Defendants knew of his medical history, had notice of the potential complications associated with Gentamicin, and should have tested him for toxicity during the administration of the antibiotic.  It should be noted that Defendants were treating Plaintiff for life threatening bacteria, and the choice of the antibiotic Plaintiff was treated with was a matter of the doctor's decision to save Plaintiff's life.   A decision was made to use a strong antibiotic, and Plaintiff was informed.  During treatment, Plaintiff made complaints, but those complaints were not solely indicative of toxicity, and Plaintiff had experienced the symptoms of dizziness, weakness, and loss of hearing prior to admission to RMC. [Ex. K, p46; Ex. L, p23:39] Secondly, Plaintiff responded to the treatment administered in response to the complaints up to the point the test were ordered.  When Plaintiff did not respond or made a complaint that alerted Defendants to the over sight, action was taken immediately.   Prior to that, during the course of Plaintiff's treatment, Defendants failed to make the connection that Plaintiff was not being tested for toxicity. [Exs. A,B]

> [A] complaint that a physician has been negligent in diagnosing or treating
> medical condition does not state a valid claim of medical mistreatment under
> the Eighth Amendment. Medical malpractice does not become a constitutional
> violation merely because the victim is a prisoner. In order to state a

cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

Estelle, 429 U.S. at 106.

Since Defendants did not make the connection that Plaintiff's blood was not being tested for toxicity, Plaintiff cannot prove deliberate indifference.   "There is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not . . . .'" Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996) (quoting Farmer, 511 U.S. at 838); see Haley v. Gross, 86 F.3d 630, 641 (7th Cir. 1996) (holding that "negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk").

The Court appointed experts opined that the failing to test Plaintiff's blood for toxicity, while Plaintiff's blood was never the less being tested, was deliberate indifference.  Defendants submit that at best this might have been negligence.  The omission was not intentional or more than gross negligence, but was in oversight committed in the efforts to save Plaintiff's life.  The Court appointed experts' testimony that this is a breach of the standard of care, is rebutted by the testimony of Defendants' Expert that stated that the oversight was not a breach of the

standard of care. Ex. G[1]

Moreover, Plaintiff's expert testimony is only relevant to the objective issue of deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1371 (11th Cir. 1999)(Stressing  that under Farmer, "the official's conduct is judged by what he actually knew, not by what a reasonable person in his shoes would have known.")   There is no evidence that Defendants knew that Plaintiff was not being tested for toxicity, because when it was thought to be a problem, the test were ordered, and Plaintiff was taken off the drug.   This is an issue of whether Defendants committed medical malpractice and not deliberate indifference.  This drug was given to Plaintiff despite the risks involved, and according to Plaintiff in his first complaint filed about this case, these risks were explained to him. [ Ex. O, p7)  Plaintiff proceeded  with the treatment to save his life.  There is nothing in the record demonstrating that Defendants' knew that Plaintiff was not being tested and refused to test him or that Plaintiff's blood was not tested to save money. Therefore, this claim of deliberate indifference should be dismissed on summary judgment.

III.    Failure to train or supervisor

Plaintiff seeks to impose supervisory liability against Defendants based on the failure to adequately supervise Defendant Beiser.    A supervisory official is not liable under § 1983 for failure to train unless: (1) his failure to train amounts to deliberate indifference of the rights of persons his subordinates come into contact with; and (2) the failure has actually caused

---

[1] "[A] District court may consider a hearsay statement in passing  on  motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Jones v. UPS Ground Freight, 682 F.3d 1283, 1293–94 (11th Cir. 2012)

the injury of which the plaintiff complains. See Keith v. DeKalb Cty., Georgia, 749 F.3d 1034, 1052–53 (11th Cir. 2014). Thus, Plaintiff must demonstrate that Defendants had actual or constructive notice that a particular omission in their training program caused Beiser to violate his constitutional rights and, despite that notice, chose to retain the deficient training program. Id. at 1052.  To establish that a supervisor had actual or constructive notice of the deficiency of training, a pattern of similar constitutional violations by untrained employees is necessary. Id. at 1053.

Plaintiff has not and cannot make this showing because Defendant Beiser has been dismissed from this case, and there will not be a ruling that he violated Plaintiff's constitutional rights.  Even assuming that a training program was deficient and even if that failure to adequately train or supervise did cause Plaintiff an injury, again, Beiser has been dismissed from this case and therefore, there will be no ruling on a constitutional violation against Beiser, in order to hold Defendants liable as supervisors.  Additionally, there is no evidence that Defendants had actual or constructive notice of the deficiency of the training. There is no evidence that any other inmate had suffered any harm as a result of not being tested for toxicity.  Therefore, the single incident involving Plaintiff cannot be termed the result of "a pattern of similar constitutional violations." See id. Thus,  Plaintiff cannot establish a constitutional violation grounded in the failure to train or supervise personnel.

## IV.    PLAINTIFF'S INJURIES

Plaintiff claims his injuries are loss of balance, dizziness, loss of focus, confusion, motion sickness; loss of hearing; loss of equilibrium; aggravated kidney disease; anemia; and hallucinations. (Doc. 14 at 23).   In Ex. O, Plaintiff alleged that his injuries were loss of hearing and equilibrium, anemia, and renal dysfunction. (Ex. O, p22 ].  These injuries are all injuries that Plaintiff experienced prior to being placed on the Gentamicin, See [Exs. E, M,p1-2] or injuries unrelated to Gentamicin. [Ex. G].  Moreover, Plaintiff's BUN and creatine levels returned to roughly the same levels they were prior to the administration of  Gentamicin. [Exs. G; M] .

No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The Eleventh Circuit is in accord that, under 42 U.S.C. § 1997e(e), compensatory and punitive damages are unavailable, absent physical injury.  See Al-Amin v. Smith, 637 F.3d 1192, 1199 (11th Cir. 2011) (stating that the law of the Eleventh Circuit is "unmistakably" that 42 U.S.C.A. § 1997e(e) precludes the recovery of punitive damages in the absence of the requisite physical injury); Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007), abrogated by Sossamon v. Texas, 563 U.S. 277, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011) (stating that 42 U.S.C.A. § 1997e(e) precludes an inmate's claims for compensatory and punitive damages without a prior showing of physical injury); Slicker v. Jackson, 215 F.3d 1225, 1229 (11th Cir. 2000) ("compensatory damages

under § 1983 may be awarded only based on actual injuries caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated"). The physical injury requirement applies to all federal claims, including constitutional claims. Harris v. Garner, 216 F.3d 970, 984–85 (11th Cir. 2000).

Because Plaintiff's alleged injuries are injuries Plaintiff suffered prior to being place on Gentamicin or injuries unrelated to the drug, Plaintiff's claims for compensatory and punitive damages must be dismissed on summary judgment.

## V.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Defendants assert that they are entitled to qualified immunity.    Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Howard v. Wilkinson, 305 F. Supp. 3d 1327, 1337 (M.D. Fla. 2018) (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. Plaintiff has to show that there is a constitutional violation. Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007). Second, the plaintiff must allege that the constitutional right was "clearly established" at the time of the alleged misconduct. Pearson, 555 U.S. at 232, 129 S.Ct. 808. Because qualified immunity provides a complete defense from

suit, "courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013).

Howard, 305 F. Supp. 3d at 1337.

Defendants were acting within the scope of their discretionary authority as FDOC health care providers.  Plaintiff cannot prove a violation of his constitutional right and there is no way for Defendants to have known that prescribing Plaintiff Gentamicin   in an effort to save his life, and not knowing that Plaintiff's blood was not being tested for toxicity was a violation of his constitutional rights.  Therefore, the Defendants are entitled to qualified immunity and summary judgment should be granted in their favor.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

/S/Shirley Wilson Durham
Shirley Wilson Durham
Senior Assistant Attorney General
Florida Bar No. 0993204
Office of the Attorney General
The Capitol PL-01
Tallahassee, Florida 32399-1050
Telephone: (904) 348-2724 x216
Facsimile: (904) 858-6983
Shirley.durham@myfloridalegal.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this Motion for Summary

Judgment has been furnished by US Mail this 10th  day of May 2019 to:


Jeffrey H. Klink, P.A.
8916 South Mobley RD
Tampa, FL 33626-1509

/S/Shirley Wilson Durham
Shirley Wilson Durham
Senior Assistant Attorney General

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES MELVIN CRAMER,
        Plaintiff,

v.                                              Case No.: 3:13-cv-262-BJD-JRK
DR. PAGE A. SMITH &
Dr. J. JORGE-CARABALLO,
        Defendants.
_____/

## INDEX TO EXHIBITS

1.  Ex A.   Declaration of Defendant Smith

2.  Ex. B   Declaration of Defendant Caraballo

3.  Ex. C   RMC Admission

4.  EX. D  List of Medications

5.  Ex. E   Hearing Loss Medical Records

6.  Ex. F   Memorial Hospital Discharge Records

7.  Ex. G   Dr. Sharma's Expert Report

8.  Ex. H   List of Available Drugs

9.   Ex I    Doctors Progress Notes

10. Ex. J   RMC Admission and Discharge on 2/24/10

11. Ex. K   Deposition of Defendant Smith

12. Ex. L   Deposition of Defendant Caraballo

13. Ex  M   BUN TEST

14. Ex. N   Nurses Daily Notes

15. Ex. O   District of Southern Florida Complaint

16. Ex. P   Florida Department of Corrections' Health Information Transfer /Arrival Summary

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

/S/Shirley Wilson Durham
Shirley Wilson Durham
Senior Assistant Attorney General
Florida Bar No. 0993204
Office of the Attorney General
The Capitol PL-01
Tallahassee, Florida 32399-1050
Telephone: (904) 348-2724 x216
Facsimile: (904) 858-6983
Shirley.durham@myfloridalegal.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this Index to Exhibits has been furnished by US Mail this 3rd  day of May 2019 to:

Jeffrey H. Klink, P.A.
8916 South Mobley RD
Tampa, FL 33626-1509

/S/Shirley Wilson Durham
Shirley Wilson Durham
Senior Assistant Attorney General