UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES MELVIN CRAMER,

        Plaintiff,

v.                                Case No. 3:13-cv-262-J-39JRK

DOCTOR CHRISTOPHER BEISER, et al.,

        Defendants.

_____

## ORDER

### I. Status

Plaintiff, James Melvin Cramer, an inmate of the Florida penal system, is proceeding on an Amended Complaint (Doc. 14; Am. Compl.), which he filed himself. Plaintiff is now represented by Court-appointed counsel. See Order (Doc. 101). In his Amended Complaint, which is verified under penalty of perjury, Plaintiff asserts Defendants, Dr. Page A. Smith and Dr. J. Jorge-Caraballo, were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Am. Compl. at 6, 16-17, 21.[1] Plaintiff alleges the following injuries: loss of balance,

---

[1] In his Amended Complaint, Plaintiff also names as defendants Dr. Christopher Beiser and the Secretary of the Florida Department of Corrections (DOC) Michael Crews. See Am. Compl. at 1. On August 15, 2014, the Court granted Crews's motion to dismiss and dismissed him from this action (Doc. 61). On July 13, 2018, pursuant to Plaintiff's and Dr. Beiser's joint motion for dismissal, the Court entered an order dismissing Dr. Beiser (Doc. 128).

dizziness, loss of focus, confusion, motion sickness, loss of
hearing, loss of equilibrium, aggravated kidney disease, anemia,
and hallucinations. Id. at 23. As relief, Plaintiff seeks
compensatory and punitive damages. Id. at 24.

Before the Court are the following motions: Plaintiff's
Motion for Summary Judgment (Doc. 148; Pl. Motion), to which
Defendants have responded (Doc. 154; Def. Resp.); Defendants'
Motion for Summary Judgment (Doc. 153; Def. Motion), to which
Plaintiff has responded (Doc. 156; Pl. Resp.); and Plaintiff's
Motion for Discovery from Non-Party (Doc. 146; Disc. Motion), which
Defendants oppose (Doc. 152; Disc. Motion Resp.).

## II. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if
the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(a). An issue is genuine when the
evidence is such that a reasonable jury could return a verdict in
favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93
F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville
Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere
scintilla of evidence in support of the non-moving party's
position is insufficient to defeat a motion for summary judgment."
Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243,

1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

On summary judgment, a party opposing the motion must point to evidence in the record to demonstrate a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." <u>Anderson</u>, 477

U.S. at 248. In determining whether summary judgment is

appropriate, a court "must view all evidence and make all

reasonable inferences in favor of the party opposing summary

judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir.

1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del</u>

<u>Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

When a court is presented with cross motions for summary

judgment, the court must evaluate each motion separately to

determine whether either party is entitled to the relief sought.

In accordance with Rule 56, when evaluating the merits of each

motion, the court must construe the facts in the light most

favorable to the non-moving party. <u>See</u> 10A Charles Alan Wright &

Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2720 (4th ed.,

August 2019 update) ("The court must rule on each party's motion

on an individual and separate basis, determining, for each side,

whether a judgment may be entered in accordance with the Rule 56

standard.").

### III. Complaint Allegations[2]

In his Amended Complaint, Plaintiff alleges Defendants were

deliberately indifferent to his serious medical needs with respect

---

[2] Because Plaintiff is now represented by counsel, who has supported his motion with evidence, the Court provides an abbreviated summary of Plaintiff's factual allegations in his Amended Complaint.

to the administration of an intravenous (IV) antibiotic, gentamicin. Am. Compl. at 8, 17. Plaintiff alleges he was admitted to the Reception and Medical Center (RMC) hospital ward on January 3, 2010, because he had trouble overcoming complications following the removal of a boil from his buttocks. Id. at 6.

Plaintiff alleges gentamicin is highly toxic, and he was more susceptible to toxicity than other patients because he had a kidney disorder. Id. at 15-16. According to Plaintiff, the "manufacturer's label specifically warns about closely monitoring [for] toxicity . . . in patients with preexisting kidney problems." Id. at 13. Plaintiff asserts Drs. Smith and Jorge knew Plaintiff had not been tested for gentamicin toxicity.[3] Id. at 15-16, 21-22, 23.

Plaintiff asserts he displayed and complained of symptoms associated with toxicity from January 20, 2010, through February 10, 2010, including vomiting, dizziness, lack of balance, ringing in the ears, and nausea. Id. at 18, 22. Plaintiff alleges that despite his verbal complaints and outward symptoms of toxicity, and in contravention of the manufacturer's recommendations,

---

[3] Plaintiff alleges he was primarily under the care of former-Defendant Christopher Beiser, who was then a medical student under Defendants' supervision. Am. Compl. at 11, 24. Plaintiff alleges Dr. Smith prepared a treatment plan after reviewing the results of initial tests, and then Dr. Smith placed Plaintiff in the hands of the medical student. Id. at 12. Plaintiff asserts Drs. Smith and Jorge failed to adequately train or supervise the medical student. Id. at 7-8.

Defendants did not order tests to monitor gentamicin levels in his blood until February 10, 2010, thirty-seven days (111 doses) after the treatments began. Id. at 14, 16.

### IV. Plaintiff's Motion

Plaintiff moves for summary judgment on the issue of liability. Pl. Motion at 1. According to Plaintiff, Defendants' conduct constitutes more than mere (or gross) negligence. Id. at 4, 13-14, 15 n.5. Plaintiff contends the evidence shows Defendants were aware of the risks involved in the administration of gentamicin in a patient with renal insufficiency, knew what needed to be done to avoid or minimize the known risks, and failed to take appropriate action with no medical justification for failing to do so. Id. at 4, 17.

Specifically, Plaintiff asserts Defendants failed, for five weeks, to test the gentamicin levels in his blood despite knowing periodic tests were indicated and despite Plaintiff's complaints and symptoms that should have put them on notice he was experiencing possible gentamicin toxicity. Id. at 13-14. Plaintiff concludes, "Defendants consciously made numerous treatment decisions and entered numerous orders daily over the course of more than 5 weeks . . . knowing . . . they also needed to monitor that treatment. . . . [T]he conscious failure of Defendants to have acted on their actual knowledge sooner epitomizes 'deliberate indifference.'" Id. at 15 n.5.

## V. Defendants' Motion

Defendants argue Plaintiff fails to establish they were deliberately indifferent to a serious medical need and fails to show they did not adequately train or supervise Dr. Beiser.[4] Def. Motion at 17, 19. They also assert they are entitled to qualified immunity. Id. at 21-22. Finally, Defendants assert Plaintiff fails to demonstrate a physical injury under 42 U.S.C. § 1997e(e), stating his claimed injuries are either pre-existing or not causally related to gentamicin toxicity. Id. at 20-21.

As to Defendants' argument regarding a failure to train or supervise claim, Plaintiff clarifies his claims against Defendants are not premised on vicarious or supervisory liability but rather on the "actions and omissions that lay exclusively within the scope of Defendants' known duties." Pl. Resp. at 1-2. Plaintiff acknowledges he does not claim to have suffered harm because of Dr. Beiser's deliberate indifference or his failure to follow Drs. Smiths' or Jorge's instructions. Id. at 2. As such, Defendants' motion with respect to a claim for failure to train or to supervise is moot.

---

[4] It is undisputed that when Plaintiff was treated at RMC, Christopher Beiser was a medical student. However, the Court acknowledges Beiser's current status as a physician and will use the appropriate designation of "Dr." when referencing him.

## VI. Facts[5]

This case boils down to whether and when a physician's course of treatment crosses the line from mere negligence, which is not actionable under § 1983, to deliberate indifference, which is. Generally, the parties do not dispute the facts related to Plaintiff's course of treatment. For instance, in their declarations (Doc. 153-1; Def. Ex. A) (Doc. 153-2; Def. Ex. B), Defendants acknowledge Plaintiff's admission to RMC was precipitated by an infection on his buttocks. Def. Ex. A ¶ 8; Def. Ex. B ¶ 7. According to the "physician's order sheets" (Doc. 148-8; RMC Phys. Orders), and as confirmed by Defendants in their depositions (Doc. 148-5; Smith Dep.) (Doc. 148-6; Jorge Dep.), Joseph Charles, M.D., was on duty when Plaintiff was admitted to RMC. Smith Dep. at 48; Jorge Dep. at 45; RMC Phys. Orders at 1.

---

[5] Because the Court is presented with cross motions for summary judgment, the facts are drawn from the exhibits Plaintiff and Defendants offer in support of their motions. Defendants' exhibits will be cited as "Def. Ex." followed by the letter designation Defendants assign each exhibit (for example, "Def. Ex. A"). Plaintiff does not individually label his motion exhibits; rather, Plaintiff's exhibits appear in various places on the Court's docket. See Plaintiff's amended exhibit index (Doc. 149-1). As such, the Court will cite Plaintiff's exhibits by reference to the document type or the document's contents. When referencing either party's exhibits for the first time, the Court will indicate the document number and identify how the Court will subsequently cite the exhibit. In some instances, Plaintiff and Defendants offer the same exhibits. In those instances, the Court will cite the exhibit by reference to one document number only. Page numbers reflect the pagination assigned by the Court's electronic docketing system.

The RMC healthcare authorization form (Doc. 153-3; Def. Ex. C) notes Plaintiff arrived via wheelchair and was in "fair" condition. Def. Ex. C at 1. Dr. Charles ordered blood panels and, in addition to another antibiotic, ordered 120 milligrams (mg) of gentamicin (the "loading dose") to be followed by 80 mg for seven days (the "maintenance dose"). RMC Phys. Orders at 1; Def. Ex. C at 1; Smith Dep. at 31-32.[6]

The RMC admission report (Doc. 153-9; Def. Ex. I) is co-signed by Dr. Smith and Dr. Beiser. The admission report notes doctors were awaiting the results of a complete blood count (CBC) and a basic metabolic panel (BMP), and "broad spectrum antibiotics" were started to treat Plaintiff's peri rectal abscess. Def. Ex. I at 5.[7] Initial blood test results (Doc. 148-7; RMC Labs) revealed Plaintiff had an infection identified as methicillin resistant staphylococcus aureus (MRSA), which Dr. Smith testified is difficult to treat. Smith Dep. at 52; RMC Labs at 3. Dr. Smith testified at deposition Plaintiff's initial blood tests also

_____

[6] In his deposition, Dr. Smith explained the initial dose of gentamicin, referred to as the loading dose, is usually higher than the maintenance dose. Smith Dep. at 31. The loading dose is administered one time. Id. at 32.

[7] The admission report notes the date of admission was January 4, 2010. Def. Ex. I at 5. Other records, however, indicate the date of admission was January 3, 2010. RMC Phys. Orders at 1; Def. Ex. I at 6, 8.

showed he suffered borderline renal insufficiency. Smith Dep. at 15. See also RMC Labs at 1.

Plaintiff offers the affidavit of Dr. Beiser (Doc. 156-1; Beiser Aff.). Dr. Beiser explains, as a medical student, he "had no authority to treat patients, prescribe medications, or order tests or examinations for them." Beiser Aff. ¶ 7. Rather, decisions regarding patient care and treatment "lay exclusively with the licensed attending physicians." Id. The physician's order sheets confirm Dr. Beiser was not the one to order medications or tests. Rather, Drs. Smith and Jorge primarily did so. See generally RMC Phys. Orders. On January 12, 2010, Dr. Jorge ordered gentamicin at 80 mg for seven days. Id. at 6. Dr. Smith ordered gentamicin at 80 mg for seven days on January 19, 2010, January 24, 2010, February 1, 2010, and February 9, 2010. Id. at 8-10, 13.

According to the RMC doctor's progress notes (Doc. 153-9; Def. Ex. I) and nurse's notes (Doc. 153-14; Def. Ex. N), Plaintiff was evaluated daily between January 3, 2010, and the date of discharge, February 19, 2010.[8] Over this time, Plaintiff complained of hearing loss, dizziness, nausea, and vomiting. Def. Ex. I at 16, 17, 22, 24. On January 23, 2010, Dr. Marie J. Garcon noted Plaintiff complained of vomiting. Id. at 16. Also on January 23, 2010, a nurse noted Plaintiff "continues to be deaf in [left] ear,

---

[8] The doctor's progress notes contain no entry for January 29, 2010. See RMC Phys. Orders at 18.

and [is] hard of hearing in [right] ear." Def. Ex. N at 43. On January 25, 2010, Dr. Smith changed a medication (not gentamicin), noting Plaintiff attributed his recent bout of nausea and vomiting to his receipt of that medication. Def. Ex. I at 17. On January 27, 2010, a nurse noted Plaintiff was "hard of hearing/deaf." Def. Ex. N at 51. On February 8, 2010, Plaintiff complained of dizziness, which he said started the week before and was constant over the weekend. Def. Ex. I at 22.

On February 10, 2010, Plaintiff complained he had nausea and vomiting the previous night. Id. at 24. Dr. Smith ordered a CBC and BMP in response to Plaintiff's complaints. Dr. Smith directed antibiotics be continued to treat the abscess. Id. On February 11, 2010, Dr. Jorge ordered Zofran and Phenergan (for nausea), RMC Phys. Orders at 14, and Plaintiff reported no longer feeling nauseous, Def. Ex. I at 24. On that same day, Dr. Jorge lowered the gentamicin dosage to 40 mg for eighth hours. RMC Phys. Orders at 14.

On February 12, 2010, Dr. Jorge ordered a "STAT BMP" and discontinued the gentamicin. Id. at 15; see also Def. Ex. I at 25. On February 15, 2010, Dr. Jorge noted Plaintiff's abscess was not healing and his creatinine and "BUN" levels were rising.[9] Def. Ex.

_____

[9] According to Dr. Smith, gentamicin is filtered by the kidneys. Smith Dep. at 11. High levels of gentamicin in the blood system is an indication the kidneys are not processing the drug; the higher level of the drug in the blood, the more likely toxicity

11

I at 26. On February 17, 2010, a different physician ordered a CBC and BMP. Id. at 27; RMC Phys. Orders at 17. On February 18, 2010, Dr. Smith noted Plaintiff's creatinine levels had increased and ordered a BMP. Def. Ex. I at 27.

On February 19, when Plaintiff showed no signs of improvement, Dr. Smith transferred Plaintiff to Memorial Hospital Jacksonville (MHJ). The discharge summary (Doc. 148-10; RMC Disch. Summ.), co-signed by Dr. Beiser and Dr. Smith, notes the following course of treatment and reason for transfer:

> After several weeks of IV antibiotics [Plaintiff's] BUN and creatinine began to rise. Antibiotics were discontinued and [Plaintiff] was hydrated with [fluids] . . . with repeated BMPs. BUN and creatinine continued to trend downwards. [Plaintiff] was no longer able to be treated with IV antibiotics. He has subsequently developed a left lower quadrant pain that became tender to touch. CT machine was not working. We were unable to get a CT due to the machine not working on Friday. Subsequently, it was discussed with the surgeon at Regional Memorial and he was transferred.

RMC Disch. Summ. at 4. See also Def. Ex. A ¶ 15; Def. Ex. B ¶ 14.[10] When Plaintiff was transferred to MHJ, he was in "obvious kidney

---

is an issue. Id. BUN and creatinine measurements help show a patient's kidney function. Id. at 14-15. BUN measures "[n]itrogen waste products from protein metabolism," and creatinine is a "chemical or enzyme that's broken down . . . and filtered through the kidneys." Id.

[10] After physicians at MHJ stabilized Plaintiff, on February 23 or 24, 2010, Plaintiff returned to RMC. See Doc. 153-10 (Def. Ex. J) at 6, 9. Dr. William Nields, the RMC admitting physician,

failure." Jorge Dep. at 29-30. See also Smith Dep. at 19. Dr. Smith

testified at deposition, based on a comparison of the blood tests

on January 4, 2010, and February 10, 2010, Plaintiff's "kidney

functioning deteriorated" during that time. Smith Dep. at 19.

Defendants acknowledge in their responses to Plaintiff's

counseled interrogatories (Doc. 131-5; Smith Interrog.) (Doc. 131-

6; Jorge Interrog.), gentamicin administration carries potentially

serious side effects, including nephrotoxicity (damage to the

kidneys) and ototoxicity (damage to the ears, including hearing

loss and equilibrium issues). Smith Interrog. ¶ 2; Jorge Interrog.

¶ 1. See also Smith Dep. at 9-10, 14; Jorge Dep. at 40-41. The

Federal Drug Administration (FDA) warns gentamicin "is potentially

nephrotoxic," the risk of which is "greater in patients with

impaired renal function and in those who receive high dosage or

prolonged therapy" (Doc. 149-2; FDA Warning). Additionally, the

FDA warns, "[n]eurotoxicity manifested by ototoxicity . . . can

occur in patients treated with gentamicin, primarily in those with

pre-existing renal damage." FDA Warning at 1. According to the FDA

warning, "[p]atients treated with [gentamicin] should be under

close clinical observation because of the potential toxicity

associated with [its] use." Id. The warning provides, "[s]erum

---

noted Plaintiff's chief complaint was dizziness. Id. at 6-7.
Plaintiff was ultimately discharged from RMC on February 24, 2010.

concentration levels of [the drug] should be monitored when feasible to assure adequate levels and to avoid potentially toxic levels." Id.

Dr. Smith testified at deposition that he knew, when he treated Plaintiff, a patient with renal (kidney) insufficiency is more susceptible to the risks associated with gentamicin. Smith Dep. at 15-16. Dr. Jorge, on the other hand, denied having had such knowledge. Jorge Dep. at 15. In his answers to interrogatories, Dr. Jorge simply acknowledges he was "aware of the side effects of gentamicin use." Jorge Interrog. ¶ 2. Dr. Jorge did not state he knew when he treated Plaintiff that such side effects are heightened in a patient with renal insufficiency. Id. Drs. Smith and Jorge both also knew when they treated Plaintiff a patient's complaints of hearing difficulty and dizziness could possibly be symptoms of gentamicin toxicity. Smith Dep. at 26, 27; Jorge Dep. at 40. However, they contend nausea and vomiting are "nonspecific" symptoms, which can be caused by anything. Smith Dep. at 28; Jorge Dep. at 41.

Dr. Smith and Dr. Jorge each knew when they treated Plaintiff the risks associated with gentamicin can be lessened or avoided through "routine" monitoring of kidney function and testing gentamicin levels in the blood stream. Smith Dep. at 10-12; Jorge Dep. at 18, 56-57; Smith Interrog. ¶¶ 2, 3; Jorge Interrog. ¶ 2. However, they disagree on when monitoring should occur. Dr. Smith

testified at deposition all patients who receive gentamicin should be monitored every three to five days or at least once a week, regardless of the patient's kidney function at the start of the treatment. Smith Dep. at 11, 33. Dr. Smith stated, "[t]here should have been an order to check [Plaintiff's] [g]entamicin level probably after the third or fifth dose and then his kidney function once a week thereafter," but that was not done. Id. at 17, 55.

On the other hand, Dr. Jorge maintains there is no set schedule for monitoring gentamicin levels but rather monitoring is a matter of medical judgment and physician discretion. Jorge Dep. at 24; Jorge Interrog. ¶ 10. Dr. Jorge states in his answers to interrogatories, "[i]t was not common practice to have a set periodic test. The tests were ordered based on a physician's analysis of the situation." Jorge Interrog. ¶ 10. According to Dr. Jorge's analysis of the situation, the symptoms Plaintiff reported during his treatment (hearing loss, dizziness, nausea, and vomiting) did not indicate Plaintiff had gentamicin toxicity because the symptoms Plaintiff reported "were probably already chronic in him, like, unsteadiness, dizziness, all of those symptoms." Jorge Dep. at 24, 59.

Drs. Smith and Jorge concede Plaintiff's blood was not tested for gentamicin toxicity between January 3, 2010, and February 10, 2010, though they claim they had no knowledge such tests were not being done. Smith Dep. at 12-13, 55; Jorge Dep. at 18; Smith

15

Interrog. ¶ 10; Jorge Interrog. ¶ 6. In their answers to interrogatories, Defendants state blood tests were ordered to monitor Plaintiff's kidney function between January 4, 2010, through February 10, 2010, but those tests did not report gentamicin levels. Smith Interrog. ¶ 10; Jorge Interrog. ¶ 10. In their motion, Defendants explain they failed to notice Plaintiff was not being tested for toxicity because blood tests were being performed periodically. Def. Resp. at 2. They say, "Defendants were aware that blood test[s] . . . should have been ordered to test for toxicity; however, since Plaintiff's blood was being tested [for other reasons], neither made the connection that his blood was not being tested for toxicity." Id.

Dr. Smith contends the failure to ensure gentamicin toxicity testing was done is attributable to him and Dr. Jorge being over-worked. Smith Interrog. ¶ 10. In his answers to interrogatories, Dr. Smith states, "[t]he fact that [gentamicin] drug levels were not completed [prior to February 10, 2010] was an oversight due to [his and Dr. Jorge's] heavy work load [sic]" resulting from a shortage of physicians. Id. Dr. Smith testified at deposition he and Dr. Jorge were the only two doctors on staff at the relevant time but there should have been six doctors. Smith Dep. at 7, 48.

At deposition, Dr. Smith suggested other possible reasons the tests had not been ordered: because a different physician (not he or Dr. Jorge) started Plaintiff on gentamicin, and because Dr.

16

Beiser was the primary medical provider attending Plaintiff's care. Id. at 13. Dr. Smith recalled speaking with Dr. Beiser about Plaintiff's progress, but they did not talk about gentamicin levels. Id. Dr. Smith explained, when he spoke with Dr. Beiser, they "really didn't talk about monitoring . . . [and] whenever [Dr. Beiser] told [Dr. Smith] about the patient [Plaintiff] the patient was doing fine." Id.

Dr. Beiser avers he had no knowledge of the risks associated with gentamicin at the time he treated Plaintiff, nor does he recall Drs. Smith or Jorge providing any special instructions or precautions regarding the administration of gentamicin. Beiser Aff. ¶¶ 3, 10. Dr. Beiser states he "subsequently learned through additional training and experience that a patient treated with gentamicin (particularly one with renal deficiencies) should be closely monitored due to risks of nephrotoxicity (impaired kidney functioning) and ototoxity [sic] (impaired vestibular and auditory functioning)." Id. ¶ 3.

In their declarations, Defendants aver, "[w]hen it was determined that the [g]entamicin was affecting [Plaintiff]'s kidneys, it was stopped, [Plaintiff] was given IV fluids and Renal function was closely monitored through labs." Def. Ex. B ¶ 13; see also Def. Ex. A ¶ 14. They further declare they did not ignore any complaints by Plaintiff or those reported to them by Dr. Beiser, and they were not aware "Plaintiff's blood was not being tested

17

for toxicity" prior to February 10, 2010. Def. Ex. A ¶¶ 16, 17; Def. Ex. B ¶¶ 15, 16.

## VII. Expert Witness Opinions

### A. Defense Expert, Rakesh Sharma, M.D.

In his report (Doc. 153-7; Def. Ex. G), Dr. Sharma concludes Plaintiff "was treated within the standard of care and there was no action that was grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Def. Ex. G at 1. According to Dr. Sharma, on January 4, 2010, Plaintiff's blood work showed his "[k]idney function was normal and in fact better than it had been in 2009."[11] Id. at 2. Dr. Sharma also notes Plaintiff was monitored daily by a medical practitioner and his sugars were closely monitored through routine blood tests. Id.

Dr. Sharma concludes the injuries Plaintiff associates with Defendants' treatment were either pre-existing, not related to the gentamicin treatment, or not supported by subsequent medical records. Id. at 3-4. Dr. Sharma's overall conclusion is as follows:

> [Plaintiff's] . . . complaints are not related to Gentamicin usage [but are] . . . chronic complaints dating back to 2001 and related to uncontrolled diabetes, neuropathy, noncompliance, age related hearing loss, and

---

[11] Notably, even Dr. Smith concedes Plaintiff's January 4, 2010 blood work shows he had "borderline" renal insufficiency at the time. Smith Dep. at 15; see also Doc. 153-13 (Def. Ex. M) at 3. There is no indication Dr. Smith or Dr. Jorge compared the January 4, 2010 blood test results with previous test results.

18

hypertension. I see no evidence of actions below the standard of care on [the] part of the physicians who addressed his perirectal abscess at RMC from January 3, 2010 to February 19, 2010. There was no gross incompetence or actions that would shock the conscience on the part of the physicians. There was no detriment to [Plaintiff] as a result of the doctors' actions.

Id. at 4.

### B. Court-Appointed Expert, Loren J. Bartels, M.D., F.A.C.S.

In his report, (Doc. 119-1; Bartels Report), Dr. Bartels explains he reviewed medical records from December 2009 through April 2010. Dr. Bartels notes Plaintiff "developed significant renal impairment in late 2009," related to treatment for diabetes. Bartels Report at 1. Dr. Bartels confirms Plaintiff received gentamicin for about five weeks while at RMC. Id. Upon review of the RMC records for that five-week period, Dr. Bartels was unable to "find where BUN/Creatinine levels were sufficiently frequently measured and did not find that gentamicin trough levels were measured during that period of time."[12] Id.

With respect to the standard of care, Dr. Bartels states the gentamicin doses administered to Plaintiff were too high given

_____

[12] In his deposition, Dr. Smith explained what "trough levels" are: "The trough level is the blood level of [g]entamicin an hour or so prior to giving the next dose." Smith Dep. at 32. Dr. Smith explained, if a patient has a "very high trough then that would be an indication to decrease his dose." Id. at 33. According to Dr. Smith, the trough reading is more important than measuring the peak level, which is the reading taken about an hour after a dose of gentamicin is given. Id. at 32-33.

Plaintiff's creatinine levels were elevated prior to his hospitalization. Id. Dr. Bartels observes the doses given to Plaintiff are those "normally given to patients who do not have renal problems and are inappropriate in the context of even low grade chronic kidney disease." Id. at 2. Dr. Bartels continues, "[r]egardless of renal status, gentamicin peak and trough levels and frequent, at least biweekly, monitoring of BUN/creatinine would be normal expected practice." Id. Dr. Bartels observes, "[g]entamicin dosing was not adjusted based on renal function and renal function was not closely monitored during the Jan-Feb 2010 hospitalization." Id. Dr. Bartels found nothing in the medical records indicating either Drs. Smith or Jorge "attempted to evaluate gentamicin toxicity sufficiently." Id. at 4.

Dr. Bartels explains his opinions are somewhat limited based on his area of expertise, which is in otology. Id. at 3. In that regard, Dr. Bartels concludes "gentamicin within reasonable medical probability caused ototoxic loss of vestibular function and is with medical probability responsible for [Plaintiff's] permanent loss of balance." Id. Plaintiff's susceptibility to ototoxicity was compounded by his "pre-existing renal dysfunction aggravated by use of metformin."[13] Id. Dr. Bartels could not

_____

[13] Metformin is a medication used to treat diabetes. Smith Dep. at 38. Plaintiff was taking metformin upon his admission to RMC. Def. Ex. I at 5. Doctors continued to prescribe metformin for Plaintiff during his hospital stay. See, e.g., RMC Phys. Orders at

conclude with certainty, and without testing, that Plaintiff's hearing worsened because of Defendants' treatment, though he states, "more likely than not, [Plaintiff's] hearing worsened because of the gentamicin toxicity." Id.

### C. Court-Appointed Expert, Donald C. Kern, M.D., M.P.H.

Dr. Kern provided his opinion on November 18, 2018 (Doc. 139-2; Kern Report). Dr. Kern notes gentamicin "continues to be effective against a variety of serious bacterial infections [and] is often used in combination with other antibiotics as initial treatment for serious infections." Kern Report at 5. Dr. Kern notes, however, despite gentamicin's effectiveness, it "has a number of well recognized potential side effects," including kidney and ear damage. Id.

Dr. Kern explains a patient with pre-existing kidney or ear problems may be at greater risk of these side effects, though the risks may be mitigated by "adjusting the dosage and/or the interval dosing of gentamicin to manage the concentration of the drug." Id. at 6. According to Dr. Kern, the standard method to monitor the concentration of gentamicin in a patient's system is by "measuring peak and trough" levels. Id. Dr. Kern observes, "[b]lood tests for gentamicin concentration have . . . been available for decades."

---

3. A physician at MHJ noted in Plaintiff's discharge summary (Doc. 153-6; Def. Ex. F) that metformin "is not recommended for people with renal insufficiency." Def. Ex. F at 1.

Id. Dr. Kern concludes to a reasonable degree of medical certainty that Plaintiff suffered "at least one serious medical need as a result of the administration of gentamicin," which was recognized when Plaintiff began to show signs of decreased kidney function. Id. at 6.

Dr. Kern opines Drs. Smith and Jorge "were aware of facts from which they could draw the inference that their course of treatment presented a substantial risk of serious harm to Plaintiff." Id. at 7. In example, Dr. Kern notes Drs. Smith and Jorge held titles suggesting their competence (Medical Executive Director and Senior Physician respectively). Dr. Kern notes the "potential risks of gentamicin are long standing and well known to primary care physicians" and observes, both Drs. Smith and Jorge acknowledge in their responses to Plaintiff's interrogatories they were aware of potential risks associated with gentamicin. Id. Given Drs. Smith and Jorge were aware of the risks associated with gentamicin, knew Plaintiff presented with abnormal kidney function, and signed or co-signed most of the progress notes, Dr. Kern concludes Drs. Smith and Jorge were aware their course of treatment presented a substantial risk of serious harm to Plaintiff. Id. at 7, 8.

Additionally, Dr. Kern opines Drs. Smith and Jorge "actually drew the inference" their course of treatment posed a substantial risk of serious harm yet persisted in that course of treatment

22

anyway. Id. at 7. Of significance to Dr. Kern was Dr. Jorge's decision to lower the dose of gentamicin when Plaintiff complained of side effects, indicating "an awareness that medication concentration is related to the development of potential side effects." Id. Dr. Kern notes the medical records show "Defendants persisted in the use of gentamicin, extending the order week by week without ever checking levels." Id.

## VIII. Legal Analysis & Conclusions of Law

### A. Deliberate Indifference

An Eighth Amendment claim for deliberate indifference may not be sustained where a plaintiff demonstrates conduct that amounts to negligence or oversight. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennan, 511 U.S. 825, 835 (1970)). Likewise, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." Daniels v. Jacobs, 753 F. App'x 748, 759 (11th Cir. 2018).

While medical negligence does not constitute an Eighth Amendment violation, a deliberate indifference claim may be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. To prove a deliberate indifference claim, a plaintiff must "satisfy both an objective and a subjective

inquiry." <u>Farrow</u>, 320 F.3d at 1243. First, a plaintiff must show he had an "objectively serious medical need." <u>Id.</u> Next, the plaintiff must demonstrate the medical provider subjectively acted "with an attitude of deliberate indifference to that serious medical need." <u>Id.</u>

Defendants do not dispute Plaintiff had an objectively serious medical need. <u>See</u> Def. Motion at 17–18. Rather, Defendants disavow any knowledge gentamicin toxicity testing had not been done and assert their failure to ensure the testing was done was an "oversight" amounting to negligence. <u>Id.</u> at 17–18. As such, the parties dispute whether Defendants had actual, subjective knowledge Plaintiff's blood was not tested for gentamicin levels before February 10, 2010, or whether their lack of knowledge or their failure to order admittedly necessary testing constitutes mere negligence or something more.

A deliberate indifference claim requires a plaintiff to show the medical provider had subjective knowledge of a risk of serious harm yet disregarded that risk by conduct that amounts to more than mere negligence. <u>Farrow</u>, 320 F.3d at 1245.[14] A plaintiff who

---

[14] The Eleventh Circuit clarified its precedent requires a showing of more than "mere," as opposed to more than "gross" negligence. <u>See</u> <u>Melton v. Abston</u>, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016) (citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999) (concluding "the 'more than mere negligence' standard in <u>McElligott</u> is more consistent with <u>Farmer</u> than the 'more than gross negligence' standard")).

receives some medical treatment can demonstrate deliberate indifference when the care is so deficient that it surpasses traditional concepts of medical malpractice. McElligott, 182 F.3d at 1255.

The Eleventh Circuit has recognized a failure to provide proper medical care surpasses mere negligence when a plaintiff receives "grossly inadequate care" or "care that is so cursory as to amount to no treatment at all." Melton, 841 F.3d at 1223. See also Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985). Additionally, a physician's failure to "provide even that level of diagnostic care that [he himself] believed necessary" suggests an Eighth Amendment violation. Ancata, 769 F.2d at 704. "[T]he quality of [medical] care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to [] serious [medical] needs." Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996).

Defendants contend there is no evidence of their subjective knowledge Plaintiff faced a risk of serious harm because they did not know Plaintiff's blood was not tested for gentamicin concentration. Def. Motion at 17-18. Defendants' argument disregards that Plaintiff can satisfy his burden through reference to circumstantial evidence:

> Whether a [defendant] had the requisite
> knowledge of a substantial risk is a question
> of fact subject to demonstration in the usual

> ways, including inference from circumstantial
> evidence, and a factfinder may conclude that
> a [defendant] knew of a substantial risk from
> the very fact that the risk was obvious.

Farmer, 511 U.S. at 842 (internal citations omitted). See also Melton, 841 F.3d at 1224 ("Since a finding of deliberate indifference requires a finding of the defendant's subjective knowledge of the relevant risk, a genuine issue of material fact exists 'only if the record contains evidence, albeit circumstantial, of such subjective awareness.'").

Indeed, the Eleventh Circuit has recognized, "rarely if ever will a defendant medical professional admit that he knew his course of treatment was grossly inadequate." Campbell v. Sikes, 169 F.3d 1353, 1371-72 (11th Cir. 1999). See also Steele, 87 F.3d at 1269 (reversing summary judgment in the defendant's favor because the jury could have concluded the defendant "knew of a substantial risk from the very fact that the risk was obvious"); McElligott, 182 F.3d at 1256 n.3 (holding a jury reasonably could conclude from the totality of the circumstances the defendant doctor knew the plaintiff faced a serious risk of harm even though the doctor maintained he was subjectively unaware of some of the plaintiff's complaints of pain).

A court may consider expert witness testimony as circumstantial evidence of a defendant's subjective mental intent. Campbell, 169 F.3d at 1371. See also German v. Broward Cty.

Sheriff's Office, 315 F. App'x 773, 777-78 (11th Cir. 2009) (stating, as dicta, an expert may be warranted on remand "to determine whether [the defendant] was deliberately indifferent to [the plaintiff's] serious medical need"). However, an expert's opinion alone will not suffice; there must be other circumstantial evidence in the record to permit a factfinder to conclude a defendant had actual knowledge of a risk of serious harm. Campbell, 169 F.3d at 1372.

Here, the expert testimony demonstrates there is a genuine issue of material fact regarding whether Defendants knew Plaintiff faced a risk of serious harm. Dr. Sharma concludes the medical records show no evidence of "actions below the standard of care." Def. Ex. G at 4. However, Dr. Kern opines the records reflect Defendants knew of a substantial risk associated with the administration of gentamicin without associated testing yet persisted in their course of treatment despite that knowledge. Kern Report at 7-8.

Dr. Kern's report is not the sole evidence of Defendants' subjective intent, however. The evidence permits the conclusion that Drs. Smith and Jorge knew Plaintiff's blood was not tested for gentamicin concentration despite their assertions to the contrary. Drs. Smith and Jorge were primarily responsible for Plaintiff's care. Although Dr. Beiser met with and examined Plaintiff, Drs. Smith and Jorge supervised Dr. Beiser and directed

Plaintiff's treatment plan. Dr. Beiser avers, and Dr. Smith concedes, Dr. Beiser had no authority to order tests or prescribe medications. Beiser Aff. at ¶ 7; Smith Dep. at 13.

At his deposition, Dr. Jorge denied having had a supervisory role over Dr. Beiser, saying Dr. Beiser was "mostly" under Dr. Smith's supervision. Jorge Dep. at 44. However, in his declaration, Dr. Jorge acknowledges Dr. Beiser reported to him and to Dr. Smith. Def. Ex. B ¶ 9. Moreover, both Dr. Smith's and Dr. Jorge's primary responsibility for Plaintiff's treatment is evidenced by their signatures on the daily doctor's progress notes and physician's order sheets. <u>See generally</u> Def. Ex. I; RMC Phys. Orders. Between January 5, 2010, and February 18, 2010, forty-five progress notes were made and all except seven are signed by Drs. Smith or Jorge.[15] Def. Ex. I. Between January 4, 2010, and February 9, 2010, Dr. Smith ordered the continuation of gentamicin on four occasions. Dr. Jorge ordered the continuation of gentamicin one time, though the progress notes and physician's order sheets indicate Dr. Jorge was involved with Plaintiff's care on a regular basis between the date of admission and the date of discharge. <u>See</u> RMC Phys. Orders at 6, 8, 9, 10, 13; Def. Ex. I.

---

[15] The remaining six entries are signed by one of two other physicians, not including the admitting physician, Dr. Charles. Def. Ex. I at 16, 20, 21, 22, 26, 27.

Given all the evidence, a reasonable factfinder could conclude Dr. Smith and Dr. Jorge each had to know Plaintiff's blood was not tested for gentamicin toxicity from the very fact it was obvious. Together, they directed the continuation of gentamicin over a period of five weeks knowing the risks associated with its use and the ways to avoid those risks, though neither of them ordered that Plaintiff's blood be tested for gentamicin. Moreover, given Dr. Beiser had no authority to order tests and Drs. Smith and Jorge were the licensed physicians with such authority, any orders for blood tests had to have come from one of them.[16] Cf. Daniels, 753 F. App'x at 758 (holding the evidence did not support an inference the defendant doctor knew the results of a blood test because the undisputed evidence showed the nurses were charged with the plaintiff's care and had the authority to order tests and prescribe medications).

Even accepting Defendants did not actually know gentamicin levels were not being tested, their admitted ignorance of such a fact permits the inference they did not take the steps necessary to ensure their treatment plan was medically appropriate, such as reviewing medical records and test results. Such a failure could support the conclusion Defendants rendered "grossly inadequate

---

[16] This is especially the case accepting as true Dr. Smith's account that he and Dr. Jorge were the only two doctors working at RMC at the time.

care" or substantially deviated "from accepted standards as to evidence deliberate indifference to [] serious [medical] needs." Steele, 87 F.3d at 1269-70 (holding the defendant physician was not entitled to summary judgment despite a favorable expert witness report where the plaintiff presented evidence that the physician discontinued a medication after only a "cursory interview [with the plaintiff] and without having reviewed any medical records"); Greason v. Kemp, 891 F.2d 829, 835 (11th Cir. 1990) (holding a trier of fact could find the defendant doctor provided grossly inadequate care and knew he was doing so when the doctor abruptly discontinued an inmate's anti-psychotic medication without reviewing the inmate's file or conducting an examination).

Additionally, a factfinder reasonably could conclude the circumstantial evidence belies Dr. Smith's proffered explanation for his admitted failure to recognize gentamicin levels were not monitored (being over-worked and under-staffed). Dr. Smith testified he and Dr. Jorge were the only two doctors at RMC at the time but there should have been six. Smith Dep. at 48. However, the medical records from RMC contain the signatures of at least four doctors in addition to Drs. Smith and Jorge. Def. Ex. H at 1; Def. Ex. I at 6-7, 16, 21. Moreover, Dr. Beiser avers he does not recall any patient-care conversations with Dr. Smith or Dr. Jorge being cut short because the doctors were too busy. Beiser Aff. ¶ 7.

Given a reasonable factfinder could conclude, based on the circumstantial evidence, that Defendants were deliberately indifferent to a serious risk of harm, Defendants are not entitled to summary judgment. Defendants' assertions they did not know Plaintiff's blood was not being tested for gentamicin toxicity until February 10, 2010, presents a factual dispute and a credibility determination this Court may not make on summary judgment. See Anderson, 477 U.S. at 249 ("[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter.").

For the same reason, neither is Plaintiff entitled to summary judgment. On this record, construing the facts in the light most favorable to Defendants, a factfinder reasonably could conclude Defendants did not know Plaintiff's blood was not being tested for toxicity until February 10, 2010, and their lack of knowledge amounts to mere negligence. The records show a medical provider examined Plaintiff daily, and Defendants contend they did not ignore any complaints brought to their attention by Plaintiff or Dr. Beiser. See Def. Ex. A ¶ 16; Def. Ex. B ¶ 15; Def. Ex. I.

A jury reasonably could conclude the symptoms Plaintiff complained of over the course of his treatment (hearing loss, nausea and vomiting, and dizziness) did not alert Defendants to gentamicin toxicity under the circumstances. As Plaintiff acknowledges by affidavit (Doc. 156-2; Pl. Aff. #1), he presented

with hearing loss upon his admission to RMC. Def. Ex. I at 8; Pl. Aff. #1 ¶ 1. As to Plaintiff's complaints of nausea and vomiting, according to Drs. Smith and Jorge, those are "nonspecific" symptoms not necessarily attributable solely to gentamicin toxicity. See Smith Dep. at 28; Jorge Dep. at 41. Finally, the records reflect Plaintiff's complaints were not persistent but occurred on a few, sporadic occasions, and after steps were taken to address his complaints, Plaintiff reported feeling better. See Def. Ex. I at 16-17, 22-23.

In short, whether Defendants' self-proclaimed "oversight" constitutes negligence or deliberate indifference is a question of fact this Court may not resolve as a matter of law on summary judgment. See Rogers v. Evans, 792 F.2d 1052, 1060 (11th Cir. 1986) ("The issue is whether the questioned conduct is cruel and unusual because it involves deliberate indifference, or something more than a medical judgment call, an accident, or an inadvertent failure.") (quoting Murrell v. Bennett, 615 F.2d 306, 310 n.4 (5th Cir. 1980)). As such, neither party is entitled to summary judgment on Plaintiff's claim of deliberate indifference.[17]

---

[17] The parties also dispute whether Defendants obtained Plaintiff's informed consent to treat him with gentamicin. It is undisputed Dr. Charles initially ordered gentamicin and was the doctor on duty when Plaintiff was admitted. The patient authorization form, dated January 3, 2010, is signed by Dr. Charles. Def. Ex. C at 1. Plaintiff was "unable to sign" the form. Id. Whether Plaintiff understood the risks associated with gentamicin or whether he would have declined the treatment had he

## B. Qualified Immunity

Defendants invoke qualified immunity, asserting they were acting within the scope of their discretionary duties at the relevant times and arguing Plaintiff fails to demonstrate the violation of a constitutional right that was clearly established at the time. Def. Motion at 18, 21-22. In response, Plaintiff asserts Defendants were not acting within the scope of their discretionary duties because their conduct was not the product of medical judgment but a failure to adhere to protocols. Pl. Resp. at 4-5. Plaintiff further asserts that deliberate indifference to an inmate's serious medical needs has long been recognized as a constitutional violation. Id. at 5.

An official sued in his individual capacity "is entitled to qualified immunity for his discretionary actions unless he violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009)). Qualified immunity allows government employees to exercise their official duties

_____

known the risks are not issues this Court must resolve in ruling on the parties' motions for summary judgment. Rather, the Court focuses on whether there is evidence that Defendants were deliberately indifferent to Plaintiff's condition over the weeks during which they treated him with gentamicin regardless of whether anyone explained the risks associated with gentamicin to Plaintiff.

without fear of facing personal liability. Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018). The doctrine protects all but the plainly incompetent or those who knowingly violate an inmate's constitutional rights. Id.

Upon asserting a qualified immunity defense, a defendant bears the initial burden to demonstrate he was acting within his discretionary authority at the relevant times. Id. Defendants assert, and the record demonstrates, they were acting within the scope of their discretionary duties as physicians for the DOC at the time they treated Plaintiff. Def. Motion at 22. See also Def. Ex. A; Def. Ex. B; Def. Ex. I; Def. Ex. J; RMC Phys. Orders.

Plaintiff offers no evidence to dispute Defendants were acting within the scope of their discretionary duties at the time. Rather, Plaintiff argues Defendants were not acting within the scope of their discretionary duties because they "abdicated clear-cut, known professional duties" by their failure to test Plaintiff for gentamicin toxicity. Pl. Resp. at 3. Plaintiff's argument is not convincing. Whether Defendants provided deficient medical care in a manner that violated Plaintiff's constitutional rights is a separate question from whether Defendants acted within the scope of their discretionary duties as physicians for the DOC. As such, the Court finds Defendants carry their burden on qualified immunity.

To overcome a qualified immunity defense, a plaintiff bears the burden to demonstrate two elements: the defendant's conduct caused plaintiff to suffer a constitutional violation, and the constitutional violation was "clearly established" at the time of the alleged violation. Alcocer, 906 F.3d at 951. "Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Id. (quoting Zatler, 802 F.2d at 401).

As addressed at length above, Plaintiff alleges facts and presents evidence that, accepted as true, demonstrate Dr. Smith and Dr. Jorge, by their separate actions or omissions, were deliberately indifferent to Plaintiff's serious medical needs. Dr. Smith knew at the time he treated Plaintiff that a patient with renal insufficiency, which Plaintiff had, is more susceptible to the risks associated with gentamicin and knew gentamicin levels should be routinely monitored. Smith Dep. at 11-12, 33. Yet Dr. Smith ordered the drug four times without ordering the routine gentamicin concentration tests. See RMC Phys. Orders at 8-10, 13.

Similarly, Dr. Jorge knew the risks associated with gentamicin, was familiar with the symptoms of possible gentamicin toxicity, and knew that blood tests were indicated to monitor gentamicin levels in a patient's bloodstream. Jorge Dep. at 18,

45. Dr. Jorge was involved in Plaintiff's care for five weeks, ordering tests and medications, including gentamicin, and he admittedly did not order tests to monitor the gentamicin levels in Plaintiff's blood. See RMC Phys. Orders at 6-9, 11, 14-16.

Unlike Dr. Smith, Dr. Jorge denies having known a person with renal insufficiency is more susceptible to the side effects of gentamicin or that gentamicin monitoring should occur with any particular frequency. Id. at 15. However, a factfinder reasonably could conclude Dr. Jorge's testimony lacks credibility given Dr. Jorge was a "senior physician," and two court-appointed experts, Dr. Smith, and Dr. Beiser all recognize renal insufficiency places a patient at an increased risk of harm during the administration of gentamicin and routine blood tests are indicated. Alternatively, a factfinder could conclude Dr. Jorge's claimed lack of familiarity with this particular risk factor or the frequency with which a patient's blood should be tested, both of which are included in the FDA warning, suggests he rendered grossly inadequate medical care.

The clearly established law in the Eleventh Circuit at the time served to put Defendants on notice that a physician's treatment of an inmate can fall so far below the acceptable standard of care that it may constitute deliberate indifference. See, e.g., Campbell, 169 F.3d at 1370 (stating a plaintiff may establish a deliberate indifference claim if the direct or

circumstantial evidence demonstrates the physician actually drew the inference that his "course of treatment presented a substantial risk of serious harm . . . but persisted in the course of treatment anyway"); McElligott, 182 F.3d at 1255 (noting that the Supreme Court in Farmer clarified a plaintiff does not have to demonstrate an intent to cause him harm; "it is enough the official acted or failed to act despite his knowledge of a substantial risk of serious harm") (citing cases as examples of circumstances under which the Eleventh Circuit has held medical care was so inadequate as to constitute deliberate indifference). See also Rogers, 792 F.2d at 1058 ("Medical treatment that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness violates the eighth amendment.").

At the time Defendants treated Plaintiff, the Eleventh Circuit had recognized a plaintiff may demonstrate a genuine issue of material fact in a deliberate indifference claim with respect to the manner in which prison doctors prescribe or administer medications. Steele, 87 F.3d at 1270 (holding the plaintiff demonstrated a genuine issue of material fact as to deliberate indifference where the physician discontinued a medication after only a "cursory interview [with the plaintiff] and without having reviewed any medical records"); Greason, 891 F.2d at 835 (holding

the manner in which a prison doctor withdraws a medication can amount to deliberate indifference depending on the circumstances).

For these reasons, Defendants are not entitled to qualified immunity on summary judgment, and their motion is due to be denied.

### C. Plaintiff's Injuries

Defendants assert Plaintiff fails to demonstrate a physical injury attributable to Defendants' conduct, barring him from receiving compensatory or punitive damages under 42 U.S.C. § 1997e(e). Def. Motion at 20. In response, Plaintiff references the court-appointed experts' opinions and the medical records, which he claims demonstrate otherwise. Pl. Resp. at 2.

Defendants recognize gentamicin toxicity can cause kidney and ear damage, Smith Dep. at 9-10; Jorge Dep. at 17; Smith Interrog. ¶ 2; Jorge Interrog. ¶ 1, which are some of the injuries Plaintiff alleges he suffered as a result of Defendants' treatment, Am. Compl. at 23. Defendants argue, however, the injuries Plaintiff attributes to Defendants' conduct are pre-existing or are not causally related to gentamicin toxicity. Def. Motion at 20. Defendants provide no explanation or analysis to support their general conclusions. Instead, they rely upon Dr. Sharma's report, in which Dr. Sharma simply concludes by reference to a few medical records that the injuries Plaintiff associates with Defendants' treatment were not caused by gentamicin or are those Plaintiff complained of as far back as 2001. Def. Ex. G at 3-4.

Defendants provide some of the medical records Dr. Sharma references in his report. On April 14, 2000, Plaintiff complained of hearing problems that persisted even after the wax was flushed from his ears. Def. Ex. E at 1. He also informed the medical provider that a doctor previously told him he "had a bad liver" because he was a drinker for twelve years. Id. However, the nurse noted, "no hx [history] of kidney problems." Id. In 2001, Plaintiff complained of "unsteady gait" and having "frequent falls," though he attributed those problems to weak joints and arthritis. Id. at 4, 5. He also reported his knees and ankles "giv[ing] out" on long walks, and he reported using a cane since before his incarceration. Id. at 4. The nurse referred him to a clinician for evaluation, noting Plaintiff had "joint pain." Id.

In an affidavit (Doc. 156-2; Pl. Aff. #2), Plaintiff concedes he had hearing problems prior to being treated with gentamicin. Pl. Aff. #2 ¶ 1. However, Plaintiff explains his past hearing issues were the result of wax build-up. Id. ¶¶ 1, 2. He avers "each time [he] experience[d] [hearing loss] prior to [his admission to RMC], . . . the medical staff . . . cleared out the excessive wax . . . [and] [he] could hear normally." Id. ¶ 1. Plaintiff explains that upon his admission to RMC, on January 4, 2010, a hearing specialist flushed the wax from his ears with the same positive results previously experienced. Id. ¶ 2.

According to Plaintiff, "[a]fter 19 days of hearing normal[ly]," on January 23, 2010, he reported to a nurse that he was having problems. Id. ¶ 3. He told the nurse the hearing problems were "similar" to those he expressed when he was admitted, "except for the fact that [he] had never before experienced the deafness happening so soon after the excessive wax was removed." Id. Plaintiff says he complained to nurses or doctors on January 27th, 29th, and 30th. Id. ¶¶ 4-6. He contends "no one would take more than a minute to listen," and he became frustrated with his attempts to report the problem. Id. ¶ 6.

The Court finds Defendants fail to carry their burden on summary judgment. Defendants provide some evidence Plaintiff previously complained of hearing problems and an unsteady gait, Def. Ex. E at 1, 4, 5, though there is no evidence demonstrating whether the problems Plaintiff attributes to gentamicin are the same in nature or severity as those he reported nearly ten years before. As Plaintiff points out, Pl. Resp. at 2, Dr. Bartels suggests there may be a causal connection between Plaintiff's current hearing loss and gentamicin toxicity, even though Plaintiff previously complained of hearing loss, Bartels Report at 3. Dr. Bartels concludes, "more likely than not, [Plaintiff's] hearing worsened because of the gentamicin toxicity." Id. Dr. Bartels also attributes Plaintiff's loss of balance to gentamicin toxicity. Id. Significantly, Dr. Bartels indicates he is unable to

conclude with certainty whether gentamicin worsened Plaintiff's hearing without conducting studies and examining Plaintiff, which he has not done.[18] Id.

Dr. Smith himself concedes Plaintiff's kidneys "did get worse" between January 4, 2010, and February 19, 2010, and Plaintiff was in "chronic kidney failure" on February 19, 2010. Smith Dep. at 19. As such, the Court finds there remain genuine issues of material fact regarding whether Plaintiff sustained injuries that were caused or exacerbated by gentamicin toxicity.

## IX. Plaintiff's Motion for Discovery from Non-Party

Plaintiff seeks an order directing the DOC to respond to his subpoena requests without cost. Disc. Motion at 1.[19] Defendants oppose Plaintiff's request. See Disc. Motion Resp. According to Plaintiff, the DOC agreed to provide the responsive documents for the estimated production cost of almost $2,500.00. Disc. Motion at 1; see also Doc. 146-2. Plaintiff's attorney represents that should

---

[18] The Court previously granted Plaintiff's motion to move to reopen the discovery period after the Court's ruling on the dispositive motions, "for the limited purpose of deposing the medical experts" and to seek leave for Dr. Bartels to examine Plaintiff. See Order (Doc. 145).

[19] To meet the deadline for filing discovery motions, Plaintiff filed this motion before filing his Motion for Summary Judgment. See Disc. Motion at 1 n.1. However, Plaintiff clarifies the documents he seeks are not necessary for the Court's consideration of the parties' summary judgment motions. Id. Plaintiff states he will need the requested documents to prepare for trial. Id.

the case survive summary judgment, he will revisit discussions with DOC representatives and opposing counsel to resolve the dispute without the need for Court intervention. Disc. Motion at 2.

Given Plaintiff's representation that he will make additional attempts to resolve this issue himself, the Court will deny Plaintiff's motion without prejudice to his right to renew the motion should he be unable to reach a satisfactory resolution.

## X. Conclusion

In light of the Court's ruling on the parties' summary judgment motions, the Court finds the parties may benefit from renewed settlement negotiations. As such, the Court will direct the parties to confer and file a joint notice advising whether there is a possibility of settlement or whether this case should be set for trial. If the parties are amenable to settlement negotiations, the Court will refer the case to the assigned Magistrate Judge for a settlement conference. If the parties are not amendable to settlement negotiations, they shall provide a joint schedule with proposed deadlines for the completion of this case with a goal of trying the case by March 2020. The parties shall make every effort to resolve this case, which has been pending since 2013, without undue delay.

Therefore, it is now

**ORDERED:**

1.    Plaintiff's Motion for Discovery from Non-Party (Doc. 146) is **DENIED without prejudice.**

2.    Plaintiff's Motion for Summary Judgment (Doc. 148) is **DENIED.**

3.    Defendants' Motion for Summary Judgment (Doc. 153) is **DENIED.**

4.    By **November 4, 2019,** the parties shall confer and file a joint notice advising whether they there is a possibility of settlement or whether this case should be set for trial. If the parties are not amendable to settlement negotiations, they shall provide a joint schedule with proposed deadlines for the completion of this case, which the Court would like to try no later than March 2020.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of October, 2019.

_____

BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record